DAVIS, The JOSEPH A. See Case No. 7,-534.

DAVIS, The S. L. See Case No. 12,939.

DAVIS SEWING MACH. CO. (POTTER v.). See Case No. 11,324.

DAVISON (ADAMS EXP. CO. v.). See Case No. 73.

## Case No. 3,661.
### DAVISON v. SEAL–SKINS.
[2 Paine, 324.][1]

Circuit Court, D. Connecticut. 1835.

SALVAGE — PROPERTY RESCUED FROM PIRATES — "PIRACY" DEFINED — ADMIRALTY JURISDICTION —SEIZURE BY UNITED STATES OFFICER IN FOREIGN TERRITORY—ADMIRALTY APPEALS.

1. Salvage is demandable, of right, upon property taken from pirates. But to entitle a party to salvage in such case, the taking must have been lawful and meritorious.

2. A pirate is one who acts solely on his own authority, without any commission or authority, from a sovereign state, seizing by force, and appropriating to himself without discrimination, every vessel he meets with.

[Cited in Dole v. New England Mut. Marine Ins. Co., Case No. 3,966; The Ambrose Light, 25 Fed. 423.]

3. Robbery on the high seas is piracy. But to constitute the offence the taking must be felonious; and the quo animo may be inquired into.

[Cited in The Ambrose Light, 25 Fed. 426.]

4. If a court of admiralty has cognizance of the principal thing, it has also of the incident, though that incident would not, of itself and if it stood alone, be within the admiralty jurisdiction. Therefore, in the case of a piratical taking, the court may have jurisdiction, although the retaking was upon land. And for the same reason, goods taken by pirates and sold upon land, may be recovered from the vendee, by suit in the admiralty.

5. An officer of the United States has no right, without express directions from his government, to enter the territorial jurisdiction of a country at peace with the United States, and forcibly seize upon property found there, and claimed by citizens of the United States. Application for redress should be made to the judicial tribunals of the country.

6. Where D., an officer of the United States, without the direction of his government, seized property at the Falkland Islands, claimed by citizens of the United States, and which it was alleged had been piratically taken by one V., who pretended to be governor of the Falkland Islands under the government of Buenos Ayres, and it was proved that V. was not acting on his own authority but under a commission from the government of Buenos Ayres, it was held that the seizure of the property by D. being unlawful, a claim for salvage by A. for personal services bestowed upon the property after it was delivered over to him by D., could not be sustained.

7. Where the evidence is conflicting, and it is doubtful on which side it preponderates, the decree of the court below will not be disturbed on the ground that it is against evidence.

[Cited in The Maggie P., 25 Fed. 206.]

THOMPSON, Circuit Justice. This case comes up on appeal from a decree of the district court of the United States for the dis-

[1] [Reported by Elijah Paine, Jr., Esq.]

trict of Connecticut. This libel filed in the case is for salvage upon a quantity of seal-skins, alleged to have been saved and rescued from the unlawful and piratical capture of Lewis Vernet, at Port St. Lewis, in the Eastern Falkland Island, on the 19th of August, in the year 1831. The libel alleges the skins to have been taken from on board the schooner Superior, Congdon, master, by the said Vernet; who was wrongfully and unlawfully pretending and claiming to be governor of the Falkland Islands, under the government of Buenos Ayres, and landed and put into a store-house. Salvage is also claimed upon a quantity of seal-skins, alleged to have been taken in like manner from a boat's crew, commanded by Isaac P. Waldron, and put into the same store. The libellant [Gilbert R. Davison] states that he was carried a prisoner on board the schooner Harriet, to Buenos Ayres, where he arrived on the 20th of November, when he was liberated; and on the 1st of December he shipped as second sailing-master on board the Lexington, a sloop-of-war of the United States, commanded by Captain Duncan, and sailed for Port Lewis, and arrived there on the 27th of December, and sent a boat on shore and took the skins from the store-house, and broke up Vernet's establishment there: that he obtained a discharge as sailing-master, for the sole purpose of saving the skins for the rightful owner. The skins having been delivered by Captain Duncan to him, were put on board the schooner Dash, on the 5th day of January, 1832, and were afterwards transhipped to the schooner Carrier, of Stonington, John S. Barnum, master; who signed a bill of lading for 790 prime fur, and 401 pup-skins, consigned to Thomas Davison. The Carrier arrived at Stonington on the 15th of April, 1833. And the salvage claimed is for the personal services of the libellant, bestowed upon the skins after they were delivered over to him by Captain Duncan. The skins by order of the district court, were sold by the marshal of the district, and the money brought into court, and a claim for the proceeds was filed by Silas E. Burrows, as owner of the schooner Superior, and her cargo.

Isaac P. Waldron, in behalf of the boat's crew mentioned in the libel, or under the right of purchase made from them, filed a claim for a portion of the skins. The freight of the skins having been ordered to be paid out of the proceeds, the court decreed against the claim of the libellant for salvage; and after deducting the costs, that $704.52 should be paid to Isaac P. Waldron on his claim, and the remainder of the proceeds to be paid to Silas E. Burrows on his claim. From this decree the libellant and Burrows have severally filed an appeal; and the questions which arise under this appeal, relate, in the first place, to the claim for salvage, and, in the next place, to the respective pro-

portions of Burrows and Waldron to these proceeds.

The right to salvage in this case has been placed on the ground that the taking was piratical,[2] and gave a legal right to any person to retake, and claim a compensation for all meritorious and beneficial services rendered in saving the property. There can be no doubt that salvage is demandable of right upon property taken from pirates; and if the taking, in this case, by Vernet, is to be deemed piratical, the claim for salvage may be maintained; but to entitle a party to salvage, two circumstances must concur. The service rendered must be in a lawful taking of the property, and must be meritorious and useful. The taking must be lawful; for no claim can be maintained in a court of justice, founded on an act in itself tortious. It has, accordingly, been held, that as a recapture made by a neutral power, no claim for sal-

vage can arise, although the beneficial service rendered may be the same as if the recapture had been by a belligerent; but the act of taking by the neutral being unlawful, no right can arise from an act in itself unlawful. [Talbot v. Seeman] 1 Cranch [5 U. S.] 28. Robbery on the high seas is understood to be piracy by our law. The taking must be felonious. A commissioned cruiser, by exceeding his authority, is not thereby to be considered a pirate. It may be a marine trespass, but not an act of piracy, if the vessel is taken as a prize, unless taken feloniously, and with intent to commit a robbery; the quo animo may be inquired into. [U. S. v. Pirates] 5 Wheat. [18 U. S.] 184; U. S. v. Jones [Case No. 15,494]. A pirate is one who acts solely on his own authority, without any commission or authority from a sovereign state, seizing by force, and appropriating to himself, without discrimination, every vessel

[2] By article 1, § 8, of the constitution of the United States, congress has power to define and punish piracies and felonies committed on the high seas, and offences against the law of nations. If any person commit, upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death; or if any captain or mariner of any vessel, shall piratically and feloniously run away with such vessel, or any goods or merchandise to the value of fifty dollars, or yield up such vessel voluntarily to a pirate; or if any seaman shall lay violent hands upon his commander, thereby to hinder and prevent his fighting in defence of his ship, or goods committed to his trust, or shall make a revolt in the ship, every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and being thereof convicted shall suffer death; and the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may be brought. Act 30th April, 1790, § 8 [1 Stat. 113]. If any citizen shall commit any piracy or robbery aforesaid, or any act of hostility against the United States, or any citizen thereof, upon the high sea, under color of any commission from any foreign prince or state, or on pretence of authority from any person, such offender shall, notwithstanding the pretence of any such authority, be deemed, adjudged and taken to be a pirate, felon, and robber, and on being convicted thereof, shall suffer death. Id. § 9. Every person who shall, either upon the land or the seas, knowingly and willingly aid and assist, procure, command, counsel, or advise any person to do or commit any murder or robbery, or other piracy aforesaid, upon the seas, which shall affect the life of such person, and such person shall thereupon do or commit any such piracy or robbery, then every such person so as aforesaid aiding, assisting, procuring, commanding, counselling, or advising the same, either upon the land or the sea, shall be, and they are hereby declared, deemed and adjudged to be accessory to such piracies, before the fact, and every such person, being thereof convicted, shall suffer death. Act 30th April, 1790, § 10. After any murder, felony, robbery, or other piracy whatsoever aforesaid, is or shall be committed by any pirate or robber, every person who, knowing that such pirate or robber has done or committed any such piracy or robbery, shall, on the land or at sea, receive, entertain, or conceal any

such pirate or robber, or receive or take into his custody any vessel, goods or chattels, which have been by any such pirate or robber piratically and feloniously taken, shall be, and are hereby declared, deemed and adjudged to be accessory to such piracy or robbery after the fact, and on conviction thereof, shall be imprisoned not exceeding three years, and fined, not exceeding five hundred dollars. Id. § 11. If any person shall, upon the high seas, or in any open roadstead, or in any haven, basin or bay, or in any river where the sea ebbs and flows, commit the crime of robbery, in or upon any vessel, or upon any of the ship's company of any vessel, or the lading thereof, such person shall be adjudged to be a pirate; and being thereof convicted before a circuit court of the United States for the district into which he shall be brought, or in which he shall be found, shall suffer death. Act 15th May, 1820, § 3 [3 Stat. 600]. And if any person engaged in any piratical cruise or enterprise, or being of the crew or ship's company of any piratical vessel, shall land from such vessel, and on shore shall commit robbery, such person shall be adjudged a pirate, and on conviction thereof before a circuit court of the United States for the district into which he shall be brought, or in which he shall be found, shall suffer death. Provided, that nothing in this section contained shall be construed to deprive any particular state of its jurisdiction over such offences, when committed within the body of a county, or authorize the courts of the United States to try any such offenders, after conviction or acquittance, for the same offense in a state court. Id. § 3. If any citizen of the United States, being of the crew or ship's company of any foreign vessel engaged in the slave trade, or any person whatever, being of the crew or ship's company of any vessel owned in whole or in part, or navigated for, or in behalf of any citizen or citizens of the United States, shall land from any such vessel, and on any foreign shore seize any negro or mulatto, not held to service or labor by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall decoy, or forcibly bring or carry, or shall receive such negro or mulatto on board any such vessel, with intent as aforesaid, such citizen or person shall be adjudged a pirate, and on conviction thereof before the circuit court of the United States for the district wherein he may be brought or found, shall suffer death. Id. § 4. If any citizen of the United States, being of the crew or ship's company of any foreign vessel engaged in the slave trade, or any person whatever, being of the crew or ship's company

he meets with; and hence pirates have always been compared to robbers. The only difference between them is, that the sea is the theatre of action for the one, and the land for the other. 2 Arun. 351. Although the retaking in this case was upon land, yet if it was a piratical taking, the court might have had jurisdiction; for if the admiralty has cognizance of the principal thing, it has also of the incident, though that incident would not, of itself, and if it stood for a principal thing, be within the admiralty jurisdiction: and upon this principle it is, that goods taken by pirates and sold upon land, may be recovered from the vendee by suit in the admiralty. 1 Kent, Comm. 353. In this view of the case, it becomes proper to inquire into the situation and capacity in which Vernet was acting, and as connected therewith, the territorial government and jurisdiction of the Falkland Islands; and

it is very clear, from the evidence in the case, that he was not then acting on his own authority, but under a commission from the government of Buenos Ayres, claiming to exercise jurisdiction over the Falkland Islands.

Mr. Slocum, in his letter to the minister of foreign affairs, dated 21st November, 1831, complaining of the conduct of Vernet, asks whether the government of Buenos Ayres intends to avow and sustain the capture. The minister of foreign affairs, in his reply of November 25, informs him that the subject was under the consideration of the government, which would adopt such decision as the laws of the country required; of which Mr. Slocum, by his letter of the 26th of November, informs the minister that he cannot consider the answer in any other light than as an express admission, on the part of his government, of the right to capture American vessels fishing for seals at the Falkland Is-

---

of any vessel, owned wholly or in part, or navigated for or in behalf of any citizen or citizens of the United States, shall forcibly confine, or detain, or aid and abet in forcibly confining or detaining on board such vessel, any negro or mulatto, not held to service by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall, on board any such vessel, offer or attempt to sell as a slave, any negro or mulatto, not held in service as aforesaid, or shall, on the high seas, or anywhere on tide-water, transfer or deliver over to any other vessel, any negro or mulatto, not held to service as aforesaid, with intent to make such negro or mulatto a slave, or shall land or deliver on shore from on board any such vessel, any such negro or mulatto, with intent to make sale of, or having previously sold, such negro or mulatto as a slave, such citizen or person shall be adjudged a pirate, and on conviction thereof, before the circuit court of the United States for the district wherein he shall be brought or found, shall suffer death. Id. § 5.

The president of the United States is authorized and requested to employ so many of the public armed vessels as in his judgment the service may require, with suitable instructions to the commanders thereof, in protecting the merchant vessels of the United States, and their crews from piratical aggressions and depredations. The president of the United States is authorized to instruct the commanders of the public armed vessels of the United States, to subdue, seize, take, and send into any port of the United States, any armed vessel or boat, or any vessel or boat, the crew whereof shall be armed, and which shall have attempted or committed any piratical aggression, search, restraint, depredation, or seizure, upon any vessel of the United States, or of the citizens thereof, or upon any other vessel: and also to retake any vessel of the United States, or its citizens, which may have been unlawfully captured upon the high seas. Act 3d March, 1819, § 1 [3 Stat. 511]. The commander and crew of any merchant vessel of the United States, owned wholly or in part by a citizen thereof, may oppose and defend against any aggression, search, restraint, depredation or seizure, which shall be attempted upon such vessel, or upon any other vessel owned as aforesaid by the commander or crew of any armed vessel whatsoever, not being a public armed vessel of some nation in amity with the United States; and may subdue and capture the same: and may also retake any vessel owned as aforesaid, which may have been captured by the commander or crew of any such armed vessel, and send the same into any port

of the United States. Id. § 3. Whenever any vessel or boat, from which any piratical aggression, search, restraint, depredation or seizure, shall have been first attempted or made, shall be captured and brought into any port of the United States, the same shall and may be adjudged and condemned to their use, and that of the captors, after due process and trial, in any court having admiralty jurisdiction, and which shall be holden for the district into which such captured vessel shall be brought; and the same court shall thereupon order a sale and distribution thereof accordingly, and at their discretion. Id. § 4. If any seaman or other person shall commit manslaughter upon the high seas, or confederate, or attempt or endeavor to corrupt any commander, master, officer or mariner, to yield up or to run away with any vessel, or with any goods, or turn pirate, or to go over to or confederate with pirates, or in anywise trade with any pirate, knowing him to be such, or shall furnish such pirate with any ammunition, stores or provisions of any kind, or shall fit out any vessel knowingly and with a design to trade with or supply or correspond with any pirate or robber upon the seas; or if any person shall any ways consult, combine, confederate or correspond with any pirate or robber on the seas, knowing him to be guilty of any such piracy or robbery; or if any seaman shall confine the master of any vessel, or endeavor to make a revolt in such vessel: such person so offending, and being thereof convicted, shall be imprisoned not exceeding three years, and fined not exceeding one thousand dollars. Act 30th April, 1790, § 12. By the common law, piracy consists in committing upon the high seas, or elsewhere within the jurisdiction of the admiralty, such acts of robbery and depredation, as if committed on land, would have amounted to felony there. The admiralty jurisdiction does not extend in general to any offence done infra corpus comitatus. All rivers in England till they flow past the furthest point of land next the sea, are infra corpus comitatus. As to havens, creeks and arms of the sea, where the sea flows in between two points, a straight imaginary line being drawn from one point to the other, the courts of common law have jurisdiction of all offences committed within that line, as being infra corpus comitatus. It would seem, however, to be infra corpus comitatus, one must be able to see with the naked eye from one side of the creek, &c., to the other. The admiralty has exclusive jurisdiction on the coasts beyond low-water mark. And between low and high-water mark, the admiralty has jurisdiction if the offence be done upon the high water when the tide is in, and the courts of

lands, and then proceeds to deny in toto the right of Buenos Ayres to prohibit the Americans from taking seals, and protests against all acts which have been adopted by the government for that purpose, including the decree of the 10th of June, 1829, by which the said islands and coasts, and their fisheries, are declared to belong to that government; and protests against all acts of the government asserting any such right. And Capt. Duncan, in his letter of the 1st of December, admits that the captures or services by Vernet were made under the authority of that government. He, therefore, before he sailed on the expedition against the Falkland Islands, understood that Vernet was acting under the authority of the government of Buenos Ayres; and the proclamation of the 14th of February, 1832, shows the light in which the conduct of Capt. Duncan was considered. It charges him with having

invaded that rising colony, and destroying the public property, and carrying away goods legally deposited there for judicial inquiry: and Capt. Duncan, after he had broken up the establishment, and taken as prisoners all the persons found there, writes to the minister of foreign affairs that he would deliver up and set at liberty the prisoners on board the Lexington, on assurance being given by the Buenos Ayrean government that they had been acting under its authority; and the minister, in his answer of the 15th of February, 1832, expressly declares, that Vernet was appointed political and military governor of the Falkland Islands, in consequence of the decree of the 1st of June, 1829, published on the 10th of the same month; and that Vernet, and the individuals acting under his authority, could only be judged of by their own government. Here was a full and complete sanction, by the government of Buenos

---

common law, if done on the strand when the tide is out. In cases purely dependent on the locality of the act done, the admiralty jurisdiction is limited to the sea, and to the tide-water as far as the tide flows. See Lewis, Cr. Law, p. 461, and cases there cited.

In England, in a case at the admiralty session, of a murder committed in a part of Milford Haven, where it was about three miles over, about seven or eight miles from the mouth of the river, or open sea, and about sixteen miles below any bridges over the river, a question was made whether the place where the murder was committed, was to be considered as within the limits to which commission granted under St. 28 Hen. VIII. c. 15, do by law extend. Upon reference to the judges, they were unanimously of opinion that the trial was properly had. And it is said that during the discussion of the point, the construction of this statute by Lord Hale (2 Hale, P. C. 16, 17) was much preferred to the doctrine of Lord Coke (3 Inst. 111); and that most, if not all of the judges, seem to think that the common law has a concurrent jurisdiction with the admiralty in this haven, and in all other havens, creeks and rivers in this realm. Brace's Case, 2 Leach, 1093. It appeared to them that 28 Hen. VIII. applied to all great waters frequented by ships; that in such waters the admiral, in the time of Henry VIII., pretended jurisdiction; that by havens, &c., havens in England were meant to be included, though they are all within the body of some county; and that the mischief from the witnesses being seafaring men was likely to apply to all places frequented by ships. MS. Bayley, J. If a robbery be committed in creeks, harbors, ports, &c., in foreign countries, the court of admiralty indisputably has jurisdiction of it, and such offence is, consequently, piracy. Rex v. Jemot, Old Bailey, 28th Feb. 1812. It is clear that upon the open sea-shore the common law and the admiralty have alternate jurisdiction between high and low-water mark (3 Inst. 113); but it is sometimes a matter of difficulty to fix the line of demarcation between the county and the high sea in harbors, or below the bridges in great rivers. The question is often more a matter of fact than of law, and determinable by local evidence: but some general rules upon the point are collected by Mr. East. He says, that "in general it is said that such parts of the rivers, arms or creeks, are deemed to be within the bodies of counties, where persons can see from one side to the other. Lord Hale, in his treatise De Jure Maris, says, that the arm or branch of the sea which lies within the fauces terrae, where a man may reasonably discern between shore and shore, is, or at least may be,

within the body of a county. Hawkins, however, considers the line more accurately confined, by other authorities, to such parts of the sea where a man, standing on the one side of the land, may see what is done on the other: and the reason assigned by Lord Coke in the admiralty case (13 Coke, 52), in support of the county coroner's jurisdiction, where a man is killed in such places, because that the county may well know it, seems rather to support the more limited construction. But at least, where there is any doubt, the jurisdiction of the common law ought to be preferred." 2 East, P. C. c. 17, § 10 pp. 803, 804.

The question, whether the act was committed on the sea, or within the body of a county, is of main importance. For if it turn out that the goods were taken anywhere within the body of a county, the commissioners under St. Hen. VIII., can have no jurisdiction to inquire of it; and if it should appear that the goods were taken at sea and afterwards brought on shore, the offender cannot be indicted as for a larceny in that county into which they were carried, because the original felony was not a taking of which the common law takes cognizance. 2 East, P. C. c. 17, § 12, p. 805. And St. 39, Geo. III. c. 37, relates only to offences committed on the high seas, and out of the body of any county. Where a man was indicted for stealing three chests of tea out of the Aurora, of London, on the high seas, and it was proved that the larceny was committed while the vessel lay off Wampa, in the river, twenty or thirty miles from the sea, but there was no evidence as to the tide flowing, or otherwise, at the place where the vessel lay, it was held, from the circumstance, that the tea was stolen on board the vessel, which had crossed the ocean, that there was sufficient evidence that the larceny was committed on the high seas. Rex v. Allen, R. & M. C. C. R. 494. It was decided that where A., standing on the shore of a harbor, fired a loaded musket at a revenue cutter, which had struck upon a sand-bank in the sea, about one hundred yards from the shore, by which firing a person was maliciously killed on board the vessel, it was piracy; for the offence was committed where the death happened, and not at the place from whence the cause of death proceeded. 1 Hawk. P. C. c. 37, § 17. And if a man be struck upon the high sea, and die upon the shore after the reflux of the water, the admiral by virtue of his commission, has no cognizance of the offence. 2 Hale, P. C. 17, 20. And as it was doubtful whether it could be tried at common law, it was provided by statute that the offender may be tried in the county where the death stroke, poisoning, or hurt happened.

Ayres, of the acts of Vernet: and Commodore Rodgers, in his letter of the 24th of April, 1832, to the minister of foreign affairs, on the subject of Capt. Duncan's conduct, says that he, (Capt. Duncan,) previous to his departure, wished to ascertain whether the persons alluded to acted under the authority of the government of Buenos Ayres; but not being able to obtain any official declaration upon the subject, he believed that he was justified in considering them as acting without authority, and in treating them as pirates; but that as the government had since officially declared, that the establishment at the Falkland Islands was under its special protection, and that the individuals in charge of it acted under its special authority, he considered the government responsible for the improper conduct of its agents, and that the persons arrested by Capt. Duncan were no longer responsible (except to their own government) for their outrages. He should, accordingly, set them at liberty; and he declares that he acts in this measure without instructions from his government; that it is not his intention to discuss the question pending between the two governments. This he should leave to the agent duly authorized to treat upon that matter, and who, it is expected, would shortly arrive at Buenos Ayres. From this correspondence thus far, it is evident that Capt. Duncan, when he went to the Falkland Islands, and broke up Vernet's establishment, was under the impression that they were a nest of pirates; and that Commodore Rodgers, as soon as he found this to be a mistake, but that they were acting under the authority of the Buenos Ayrean government, discharged the prisoners, disclaiming to hold them as pirates: and there is no pretence, in any of this correspondence, that Capt. Duncan, in this particular act, was pursuing any special order of the government of the United States; but he was, no doubt, acting in good faith, under what he considered his duty, in protecting the rights of American citizens.

I do not mean to enter into the question whether or not American citizens had a right to take seals upon the Falkland Islands: that was a disputed question between our government and that of Buenos Ayres. But if these islands were held in the possession and under the jurisdiction of the Buenos Ayrean government, and Vernet's establishment then was under the authority and protection of that government, as it clearly was, and even admitting that Vernet had abused his power, Captain Duncan could have no right, without express directions from his government, to enter into the territorial jurisdiction of a country at peace with the United States, and forcibly seize upon property found there and claimed by citizens of the United States. Such a principle would be too hazardous to the peace of nations to be admitted in practice. If the seizure of these skins by Vernet was wrongful, and a violation of the rights

of American citizens, the presumption is, that on application to the judicial tribunals of Buenos Ayres, there would have been a restoration of the property; and if that, and all appeal to the government, should fail of redress it might become a case for the interference of the government of the injured party, and might ultimately lead to a just war. Such, according to the law of nations, would be the course to be adopted toward the citizens or subjects and the government of every sovereign power; and the weakness or strength of such power does not alter the principle. And this would seem to have been the understanding of the libellant himself, by the contract he entered into with Vernet, relative to the appeal to the tribunals of Buenos Ayres, for the trial of the right of seizure by Vernet, of the Harriet and Superior; and the employment of the Superior in sealing, until the determination and result of such trial should be known. This was an arrangement beneficial to all parties, and is not at all consistent with the charge that it was a piratical capture. I can discover nothing in the evidence to warrant the conclusion that this contract was forced upon the libellant and Captain Congar, by Vernet. It purports to have been entered into at the instance of these captains; and I see no reason to conclude that the trial would not have been proceeded in had not the property been retaken, and the whole establishment broken up by Captain Duncan, which the government of Buenos Ayres considered a gross violation of their rights. This right of taking seals (or fishery as it is called, though, perhaps, not strictly proper, as the seals are taken on shore) at the Falkland Islands, was then under discussion between our government and that of Buenos Ayres, as would appear by the letter of the secretary of state to Mr. Forbes, of the date of 10th of February, 1831, in which he says it is the wish of the president that you should address an earnest remonstrance to that government against any measures that may have been taken by it, including the decree and circular letter referred to, if they be genuine, which are calculated in the remotest degree to impose any restraint whatever upon the enterprise of our citizens engaged in the fisheries in question (the taking seal at the Falkland Islands), or to impair their undoubted right to the freest use of them. But notwithstanding this strong language on the part of our government, it did not undertake to pronounce this a piratical establishment, or to direct our public vessels to proceed there and break it up; but was negotiating on the question. Our government must have been fully apprized of the course pursued by the government of Buenos Ayres; for the decree referred to in this letter was undoubtedly the decree under which Vernet was acting. And that decree, which bears date on the 10th of June, 1829, in terms declares, that the Falkland Islands shall be governed by a military and civil governor, to be

appointed by the government of the republic, and whose residence should be on the island of Solidad, and that he should see to the regulations of the fisheries on that coast. And our secretary of state, in a letter of 29th of October, 1836, in answer to the inquiry whether our government had formally declared that it did not recognize the claims of the republic of Buenos Ayres to the jurisdiction of the Falkland Islands, says: "Measures were taken by my predecessor to ascertain on what foundation the claim of jurisdiction to these islands rested; but the sickness and death of Mr. Forbes, our charge d'affaires at Buenos Ayres, had for a time interrupted the investigation. Our right of fishery, however, in those seas, is one that the government considers indisputable, and it will be given in charge to the minister about to be sent there, to make representations against and demand satisfaction for all interruptions of the exercise of that right." Thus our government, four years after the seizure of the Superior, and, as must be presumed, with full knowledge of the fact, treated this right as a subject for negotiation between the two governments, and does not undertake to affirm such seizure to be a piratical act. And under this view of the case, I cannot consider the retaking by Captain Duncan a lawful act; and unless it was so, the claim of the libellant to compensation as for salvage services, in a court of admiralty, cannot be sustained. I do not, therefore, enter into the inquiry whether any meritorious and beneficial services have been rendered by the libellant. If any have been rendered, which in law entitles him to compensation, his redress must be sought in a court of common law, and not in a court of admiralty. The appeal of the libellant must, therefore, be dismissed.

I have not been able to arrive at so satisfactory a conclusion in relation to the distribution of the proceeds of the skins, as between Mr. Burrows and Captain Waldron. It is not denied but that all the skins taken on board the Superior belonged to Mr. Burrows; nor is it denied but that Captain Waldron was the owner of the skins taken from the boat's crew of the Belville, he having purchased the rights of the other part owners; and it is very satisfactorily established that all these skins were put into the same storehouse at Port Lewis. But the doubt arises from the difficulty of ascertaining whether the whole of the skins taken from the boat's crew were shipped on board the Thomas Lowry and sent to London, or whether a part remained, and were taken away by Captain Duncan.

The evidence upon this part of the case is certainly very contradictory in several respects, and cannot be reconciled. Vernet swears that the skins taken from the boat's crew were put separately in the store-house, and were all put on board the Thomas Lowry. In this he is contradicted by several witnesses, who swear that these skins were stored promiscuously in the store-house with the skins of the Harriet and Superior, and that the skins shipped on board the Lowry were selected from the aggregate quantity. Under this view of the case, it cannot with any satisfactory certainty be said on which side the evidence preponderates, so as at all events to justify an appellate court on this ground to disturb the decree of the court below. I am, accordingly, of opinion that the decree of the district court be affirmed.