## THE MAGGIE P.

### CITY OF ST. LOUIS v. THE MAGGIE P.[1]

*(Circuit Court, E. D. Missouri. September 22, 1885.)*

1. MUNICIPAL CORPORATIONS—DUTY AS TO WRECKS IN HARBOR.
    It is not a part of the public duty of a city to pump out and raise boats which sink at its levee, even where its charter gives it control of its levee and harbor, and makes it its duty to keep its wharf and the river along the shore free from wrecks and other improper obstacles.

2. SAME—CONTRACTS TO PERFORM PRIVATE SERVICE.
    Where public duty does not interfere with private service, a city may make a valid contract to use its instrumentalities and employ its employes in the latter; and in case of a breach by it of such a contract it becomes liable like a private contractor.

3. SAME—ESTOPPEL.
    Where a city has been in the habit of making contracts for the use of certain of its instrumentalities, and the employment of the employes connected therewith, through officers in charge thereof, and of receiving compensation for the performance of such contracts, it will be estopped, in case of a breach by it of

---

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

such a contract entered into on its behalf by such officers, from claiming that the officers acted without authority.

4. PRACTICE—APPEALS IN ADMIRALTY—DOUBTFUL QUESTIONS OF FACT.

Where, in admiralty cases appealed to this court, no question of law is involved, the decree below will not be disturbed, unless clearly contrary to the evidence.

5. SAME—PARTY NOT APPEALING.

A party who does not appeal from a decree cannot question its correctness.

In Admiralty.

*Leverett H. Bell*, for libelant.

*Chester H. Krum*, for claimant.

BREWER, J., (*orally*.) Before calling the equity docket this morning I will dispose of the case of *City of St. Louis* against *The Steamer Maggie P.*, which was argued and submitted at the spring term. The important facts are briefly these: In the forepart of February, 1884, the steamer Maggie P. was lying at the levee in this city, just below the bridge. At the breaking up of the ice the boat was crowded up against some *debris* or refuse that had been thrown on the levee and frozen there, and was injured so that she partially filled with water and sunk. On February 4th some negotiations, alleged on the one side to have terminated in a contract, but denied on the other, were entered into between the master of the boat and the assistant harbormaster for immediately pumping the water out of the steamer and raising her at that time, February 4th. Nothing, however, was then done, and the river rising, the water overflowed and filled the hull of the boat, and she remained there until the twenty-third of February, when again negotiations were entered into, and finally the harbor-boat came and pumped the water out, and the steamer was raised and towed to the dock for repairs. Thereupon the city filed a libel for these services. The claimant filed a cross-libel, claiming that on the fourth of February a contract was entered into, as above stated, which the city failed to perform, and in consequence of which damages resulted.

On the trial of the cause in the district court the court found that there was such contract made, and awarded damages to the claimant in the sum of twenty-three hundred and odd dollars. The city appealed to the circuit court, and the appeal was argued last spring. In the mean time some additional testimony was taken. When the case was first argued before me the question arose in my mind as to whether the city could make, as a municipality, a valid contract for doing the work of pumping water out of the steamer and raising her, —a contract entitling the city to compensation for performance, and exposing to liability for non-performance; whether that was not a matter outside the scope of municipal powers; and I requested counsel to furnish briefs upon that question, which they have done. I have given the matter a good deal of thought and study during the summer, and after some wavering have reached this conclusion: The principle applicable to such cases, I think, is clear, and the only diffi-

culty has been in its application to the case at bar.   I suppose a city can make no contract for the discharge of a purely public duty; such a contract as in case of performance it can enforce compensation for, or for non-performance expose itself to liability.   It cannot use public funds in any such direction.   A city cannot contract with me to put out a fire in my building, and then exact a compensation from me for the extinguishing of that fire, nor thus expose itself to liability if it failed to put out that fire.   It is discharging a purely public duty. At the same time, when it has in its possession instrumentalities, and hires employes for the purpose of discharging some public duty, I see no reason why, when the exigencies of public duties do not require the use of those instrumentalities and employes, it may not make a valid contract to use them in some private service.   Thus, take the fire department.   The city, having its engines and firemen, might make a valid contract with me to pump water out of a cellar, and compel me to pay for this service.   The contract is binding on the one side as well as on the other, and there would be a liability on its part for non-performance, except so far as performance was interfered with by the exigencies of public duty, as by the sudden occurrence of a fire.   Take the public school system.   The city builds its public-school buildings, employs its teachers, paying therefor by means of taxation.   Now, I see no reason why the city might not say to one living outside the city, "You may send your children to one of these schools for a stipulated sum."   In respect to such a matter the city would be keeping a private school, as it were,—rendering private service,—entitled to all the benefits and subject to all liabilities of a private contract.   And, generally speaking, when public duty does not interfere with private service a city may make a valid contract for the use of its instrumentalities in the latter.

Now, what power has the city given it in respect to this harbor and levee?   The fourth subdivision of section 26 of article 3 of the scheme and charter gives to the city power "to construct all needful improvements in the harbor; to control, guide, or deflect the currents of the river; to erect, repair, and regulate public wharves and docks; to regulate marine railways; to regulate and license all ferries and tow-boats, towing boats or other water-craft into or out of or within the harbor; to sell ferry privileges within the city limits, and to establish ferry rates; to create the office of port-wardens, and define their duties; to regulate the stationing, anchoring, and mooring of vessels and wharf-boats within the city; to charge and collect wharfage and tonnage dues, levee rates, and wharfage on fire-wood," etc.   Section 38 of article 4 provides for a harbor and wharf commissioner, who "shall have under his special charge the construction and repairs of dikes, wharf, and levee, and shall be specially charged with the execution of all ordinances of the city which relate to dikes, wharf, and levee, steam-boats, and all other boats, vessels, and rafts."   And article 9 creates a department of the city government, called the "Harbor &

Wharf Department," under the jurisdiction and control of the harbor and wharf commissioner.    Section 5 provides: "It shall be the duty of the harbor and wharf commissioner, and he is hereby empowered, to direct the landing and stationing of all boats, vessels, or rafts arriving at any point within the limits of the city, and to direct the discharge and removal of their cargoes; to superintend the disposition of freight, merchandise, and materials for repairs on the river bank; to keep the wharf and the river along the shore free from wrecks and other improper obstructions; and, generally, to exercise such supervision and control over the wharf and harbor, and to perform such other duties, as may be provided by ordinance."    Section 7 provides: "All moneys collected from harbor tax, wharfage dues, or other sources, relating to harbor, as well as all forfeitures, fines, and penalties imposed for violation of ordinances duly enacted relating to harbor and wharf, shall be credited to the account of harbor fund."

Thus, as you see, by these provisions large and general powers are given to the city in control of the harbor and the levees; and while these contemplate public use, yet they also carry with them the idea that the city has property rights in the levees, and is to manage them and the harbor with some view to gain.    Then, in section 15, art. 8, c. 32, of the ordinances printed in the revised ordinances of the city, it is provided that for the purpose of operating the harbor-boat, cleaning the levee, and removing wrecks and obstructions from the harbor, certain officers may be appointed, one of whom is the assistant harbor-master.    In other words, the city is given general control of the levee and the harbor, and the special duties of the harbor-boat are the cleaning of the levee, and removing wrecks and obstructions from the harbor.    Also, it appears from the testimony that it acted at times in aid of the police department.

Now, pumping water out of a sunken boat and raising it is a matter of principally private interest to the owner of the boat.    It cannot be said to be of a public nature.    Of course the removal of the boat, if it is a wreck, is a matter in which the public is interested, that the harbor may be kept clear for other boats; but so far as the mere lifting of that boat out of the water by pumping the water out of the hold, that is a matter which specially interests and affects the owner of the boat.    Such a contract as that, it seems to me, is one for private service, although I confess that, incidentally, it does affect the public, in that it operates to keep the harbor clear.    It is also true that there is no authority in any ordinance—at least, none that has been cited—specifically empowering any officer of the city to contract for doing this kind of service.    But I do not think that is very material, because the testimony shows that the city, through its officers, has been in the habit of making these contracts and receiving compensation therefor; and having made that a business, so to speak, having received gain from such contracts, it does not lie in its mouth to say now that there was no officer authorized by ordinance to make

this kind of contract. It has been doing the work and making money out of it, and if it has now made an unfortunate contract it cannot say, "Nobody was authorized." So, as I said, after a good deal of study, and some hesitation, it seems to me if there was a contract made in this case, that it was binding on the city, and non-performance exposed the city to liability.

That compels an examination of the evidence. The testimony of the master of the boat is clear and positive as to the circumstances which took place when he interviewed the assistant harbor-master. It is true that the testimony of the assistant harbor-master and some other testimony leaves in my mind a doubt as to whether both parties at the time understood that a definite contract as to the work to be done, and the time at which it was to be done, was entered into. I do not see that the additional testimony taken since the trial before the district court throws any special light upon this question. While it is true that this case, by appeal, comes to the circuit court for an examination of the evidence, yet it is also true that there is in such a proceeding something of the nature of error and review, and the principle applies that the judgment of a competent tribunal upon questions of fact is not to be disturbed upon uncertainty and doubt.

The authorities are gathered here in Desty on Federal Practice, in reference to the rule governing circuit courts on appeals in admiralty cases. "If a court cannot determine on which side the evidence preponderates, it will affirm the decree of the district court;" citing *The Sampson*, 4 Blatchf. 28; *The Florida*, Id. 470; *The Sunswick*, 5 Blatchf. 280; *The Heroine*, 6 Blatchf. 188; *Davison* v. *Sealskins*, 2 Paine, 324. "And where no question of law is involved in the decree of the court below, the decree will not be disturbed unless it is clearly contrary to the evidence." *The Grafton*, 1 Blatchf. 173; *Baker* v. *Smith*, Holmes, 85; *The Potomac*, 18 How. Pr. 185.

Following that principle, whatever doubt exists in my mind as to whether there was a contract—a definite mutual understanding—by the parties at the time, I think that, in view of the positive, distinct, and direct testimony of the master, it cannot be said that the decree of the district court was clearly against the evidence.

On the other hand, the claimant insists that the damages awarded in the district court were insufficient, and asks this court to increase them several hundred dollars. For two reasons I think they should not be increased: *First.* The claimant took no appeal, and a party who does not appeal from a decree cannot question its correctness. *The Alonzo*, 2 Cliff. 548; *Allen* v. *Hitch*, 2 Curt. 147; *The Boston*, 1 Sum. 328. *Second.* If an appeal had been taken by claimant, and the case stood before me as an original case, and without any previous judgment, my doubt would be, not whether damages as here awarded were large enough, but whether such sum was not too large.

The decree of the district court will therefore be affirmed, and judgment entered for the amount, with interest.