219, 252. WRIGHT *v.* FLOYD COUNTY, and *vice versa.*

1. Where, by statute, jurisdiction over a subject-matter is conferred upon county authorities, and therein the power to do certain things is expressed, the further power to contract in regard to that subject-matter is to be implied; and a part of this implicit power is the authority to use discretion as to the details of such contracts, subject only to the limitations imposed by the statutes or public policy of the State.
2. There is nothing in the statutes or public policy of this State which prohibits the proper county authorities from making a contract with the owner of a mill site, near which a public highway, including a bridge, is to be erected, whereby the mill owner deeds to the county the right of way for the highway and contributes to the erection of the bridge on condition that he shall have the right to join his mill-dam to the piers of the bridge and use them as bulkheads, unless such an arrangement would manifestly endanger the safety or convenience of the public.
3. The jurisdiction of determining whether such an arrangement will be detrimental to the good of the public, or of the county in its corporate capacity, is primarily vested in the county authorities having in charge the subject-matter of roads and bridges.

Complaint, from city court of Floyd county—Judge Hamilton. January 29, 1907.

Argued March 25,—Decided April 11, 1907.

*Seaborn & Barry Wright, W. M. Henry,* for Wright.

*Junius F. Hillyer,* contra.

POWELL, J.   On May 16, 1905, by a written contract, made between Wright and Floyd county, through its county commissioners, and reciting, that said Wright is the owner of the lands on both sides of the Armuchee creek at the old Jones mill in said county, including the mill and water rights, and the county is the owner of a bridge across the creek at or near said mill, on the Dalton public road; that, it being necessary to repair said bridge by substituting two stone or concrete piers for the wooden bents now in use, one pier to be located at the north end and the other at the south end of said bridge, and Wright desiring to build his mill-dam and race anew at or near said bridge and to use said bridge for bulkheads or stays for the same, it was agreed, that Wright, at his expense, would build one of the piers, and the county, at its expense, the other, and that Wright should also build, at his expense, any additional concrete or stone pier, or work, which might in the discretion of either party be required to properly adjust the contemplated dam and race to the piers and to their use as safe and permanent supports to the bridge; all the work to be done according to the county's plans and specifications and subject to its approval.   As a further consideration it is recited that the said Wright "hereby sells and forever quitclaims to [the county] the right to keep and maintain said bridge where now located, and to rebuild or replace the same as often as may be necessary in the future; also the right of way for a public road 30 feet wide on both sides of said creek, and along the line of the road leading through his land to and from said bridge."   On the county's part, the contract states that it "agrees to allow Wright the privilege to construct his mill-dam at or near said bridge, and to make use of the piers before mentioned, as bulkheads or stays to his dam, the work to be done, as before stated, under the direction and subject to the approval of the county authorities," and that "this instrument shall operate as a deed of conveyance as far as applicable."   With the consent of Wright and at his instance, the county, after building the pier which they were to build, also constructed the one which Wright was to erect.   The cost of building the second pier was $517.10; and for this sum the county

brought suit against Wright. The latter defended the suit on the ground that the county did not have the power to convey, or to grant to him the right to use, the portion of the bridge or public highway for the purpose set out in the contract, and that, therefore, there was no consideration for the agreement on his part to pay for building a portion of the work, it being necessary for the county to do the same in order to build the bridge. The court awarded judgment in favor of the county, and Wright excepts.

1. The whole case turns upon the one question as to whether the agreement between the parties is within the contractual capacity of the county commissioners. Wright is perfectly willing to pay the amount sued for if the county can grant him the benefits contemplated in the contract, and is unwilling to pay it unless he can get them. In fact, we gather from the argument that the suit has been brought and maintained for the purpose of settling this legal question before further money is spent by Wright in pursuance of the contemplated work necessary to the completion of the dam. The county, in the brief of its able counsel, thus presents its contentions: "That the board of commissioners had jurisdiction of the subject-matter of the contract; that its discretion was practically unlimited; that such a broad discretion includes the right to agree upon price, when to be paid, how, and with what, to be paid, whether with draft on the treasurer or by transfer of property, or, as in this case, by the granting of a special license; that there is no prohibition against the board granting licenses on public easements, but that it is consistent with the broad discretion granted them, and agrees with the rights of individuals as well as the rights of the public, and is in accord with the spirit of the law as well as the rulings of our courts; that this right applies incontestibly when the grant of a license is to the owner of the fee. Further, that the record discloses that the conveyance of the right and easement specified in the contract, from the plaintiff in error to the defendant in error, was necessary to secure the public right thereto, and that this fact gives to the transaction a different character from that insisted on by the plaintiff in error." On the other hand, the distinguished ex-judge of the superior courts who appeared for Mr. Wright asserts the propositions, that county authorities have no contractual powers, except

such as are expressly conferred by law; that their powers are enumerated, and are limited by the enumeration; that nowhere has any law, either general or special, ever given the board of county commissioners of Floyd county any power to make such a contract as that sued on; that the result of the contract is to create a relation in the nature of a partnership between the public and a private individual, and to grant to the latter, for purely private purposes, a use and an easement in a public bridge, such as is not enjoyed by other individuals; that the use and easement would, by operation of universally-known natural laws, inevitably and constantly tend to injure and destroy the bridge and to impair its usefulness for public travel, and thereby to create a public nuisance.

By the State constitution, article 11, sec. 1, par. 1 (Civil Code, §5924), "Each county shall be a body corporate, with such powers and limitations as may be prescribed by law;" and by article 6, section 19, paragraph 1 (Civil Code, §5879), "The General Assembly shall have power to provide for the creation of county commissioners in such counties as may require them, and to define their duties." The constitution of 1868 contained a similar provision as to county commissioners. It has been held, under these sections, that neither counties nor county commissioners possess any powers unless expressly conferred by, or fairly to be implied from, such statutes as may be passed in relation thereto. *Albany Bottling Co. v. Watson,* 103 *Ga.* 503. It is therefore necessary to consider what statutes have been passed upon this subject. By act of December 13, 1871 (Ga. Laws of 1871-2, p. 225), the board of county commissioners of Floyd county was established. By the fourth section of this act it is provided: "That said board shall have exclusive jurisdiction, when sitting for county purposes, over the following subject-matters: in governing and controlling all property of the county, as they may deem expedient, according to law, . . in establishing, altering, and abolishing all roads, bridges, and ferries, in conformity to law." The fifth section of the same act confers upon them all the powers possessed by the justices of the inferior court prior to the adoption of the constitution of 1868, so far as related to county matters; and this, by reference, gave them the jurisdiction "to appoint the places for the erection of public bridges, county ferries, turnpikes, and causeways, and to

make suitable provision for their erection and repairs, by letting them out to the lowest bidder, hiring hands, or in any other way that may be for the public good and agreeable to law" (Code of 1868, §710; and see Political Code of 1895, §602); also "to sit at any time as a court for county purposes and for the exercise of any power they possess as a quasi-corporation contradistinguished from their power as a court;" and also "to exercise such other powers as are granted by law or are indispensable to their jurisdiction." (Code of 1868, §347; and see Political Code of 1895, §4240.) At the time this contract was made the alternative road law was in effect in Floyd county, and therefore §576 (3-4) of the Political Code may be applicable, as follows: "They [referring to the county commissioners] may have said roads worked, improved, or repaired, by contracting for the same in such manner as they may deem fit, with private parties or corporations; provided, that if the work is done by contract, the contractors shall be required to employ the chain-gang, if established, and the labor of those who do not pay the commutation tax, and to pay for the same. They may employ or combine any or all of said three above-mentioned methods, or may use any other method or system that may be desired for accomplishing the work necessary to put and keep the public roads in good condition." It should be remembered, in this connection, that by the Political Code, §5, the word "road" wherever it appears in a statute, includes all bridges thereon, unless the context requires a different construction. These statutes manifestly purport to confer upon the county commissioners a jurisdiction, coupled with some considerable degree of discretion, over all road matters, including bridges, and the erection and maintenance thereof. Dillon on Municipal Corporations (§445), taking up the contractual powers of counties, cities, towns, etc., in regard to those matters over which they are given jurisdiction by statute, asserts: "Public corporations may by their officers and properly authorized agents make contracts the same as individuals and other corporations, in matters that necessarily appertain to the corporation; being artificial persons, they can not contract in any other way;" and further (§447): "the authority to enter into contracts necessary and proper to carry into effect their powers and discharge their duties is impliedly given to every such corporation." Tiedeman on Mu-

nicipal Corporations (§163), speaking on the same subject, says they "may, unless restricted by charter or State statute, enter into any contract which may be necessary to the execution of the powers and functions conferred. . . The general power to contract in furtherance of corporate purposes is inherent in all classes of corporations, both public and private. . . Municipal corporations have all the powers of ordinary persons in regard to the contracts they are authorized to make, except when specially restricted." We will not be unmindful, in this connection, that counties, although they are corporations, are not for many purposes to be considered as standing upon the same footing with ordinary municipal corporations, such as cities and towns (*Millwood* v. *DeKalb County,* 106 *Ga.* 743, and cases cited), yet we believe that the measure of their contractual capacity, in relation to any subject-matter expressly conferred by statute, is not different from that of other public corporations. The fact that counties, which have had corporate entity thrust upon them by compulsory enactment, are not held to the same degree of liability for neglecting to perform their corporate duties as are those public corporations which have in a sense sought charters, with concurrent privileges and responsibilities, does not abridge the power of the former to execute, through contract or otherwise, the powers actually conferred, in as full and ample a manner as might the latter class of corporations under similar circumstances. We conclude, therefore, that the statements quoted above from the eminent text-writers may be relied upon as correctly declaring the contractual powers of counties in this State. In *Justices* v. *Plank Road Co.,* 9 *Ga.* 485, our Supreme Court, speaking of the inferior court, which at that time was exercising the powers of the present county commissioners, said: "They are the agents of the county for many purposes. They are authorized by law to lay out and open roads, . . they are the supervisors and managers of the property of the county— its court-house, jail, and public bridges, for example; they impose the county taxes, etc. These powers characterize them as agents; and for the purpose of their agency they are collectively a corporation with limited powers. The right to sue, etc., is incidental to their agency." In *Justices* v. *Smith,* 13 *Ga.* 504, it is said: "The justices of the inferior court are the agents and trustees for the control and management of various public interests

in the county of which they are officers. Among these are the funds for the education of the poor. For the purposes of this agency, as this court has held in the case of *Justices* v. *Plank road Company,* they are collectively, a corporation with limited powers. As such, it would seem a fair and legitimate inference, that in managing these funds, which they are required by law to receive and disburse by their agents, they have authority to require a bond from any one, as a condition on which they entrust him, as their agent, with the management and disbursement of the fund. And also, that as such agent, in their quasi corporate character, they have the right to bring suit upon such bond, in case of breach thereof." These early cases give recognition to the implied contractual power of the county authorities as to matters within their jurisdiction. In *Pennington* v. *Gammon, 67 Ga.* 456, the doctrine of implied powers is given even more explicit recognition; in that case the court held: "Any county may organize a chain-gang to be composed of convicts, who may be employed in working on the roads, streets, or other public works. The power to make provision for their safe keeping and for their constant and diligent employment was vested originally in the ordinaries, and is now vested, in some counties, in county commissioners. Such powers include the right to use those means and incur those expenses which may be reasonably necessary for their execution, not exceeding the constitutional limit. Hence county commissioners may incur a debt . . for the purchase of necessary tools or implements, not exceeding the limit set by the constitution." In the opinion in that case the following language appears: "It is not contended that the amount to be borrowed exceeds the constitutional limit. But it is insisted that $1,500.00 of this money is to be used in the purchase of a rock crusher and engine, and that no law has been passed authorizing such an increase of debt, and that no election has been held for that purpose. It is true that no law has been passed authorizing the commissioners to purchase the specific articles named, but there is a law authorizing the employment of the chain-gang on the public roads; and the right to provide the necessary implements with which to do the work must of necessity follow. There is no law authorizing the purchase of spades, shovels, hoes, axes, or anything else needed, yet it would hardly be insisted that the right to pur-

chase them did not exist. And if the commissioners should consider that the best and most economical method of working the public roads was to macadamize them, no legal reason has been given to us why they might not purchase such implements as would be needed and employ the chain - gang in that way. We can not see that the cost of the article to be purchased can affect the right to buy, so long as it does not exceed the limit of the amount they may have the power to levy, or the amount they are authorized to borrow to supply deficiencies in the revenues; and in this limitation lies the protection to the taxpayer." In *Carruth* v. *Wagner,* 114 *Ga.* 740, it was held that under the legislative grant of authority to build a court-house, the county commissioners might let a contract for the erection of the foundations only, "regardless of whether the county has or has not made a complete contract for the erection of the entire structure." Thus, step by step, we trace in our decisions recognition of the doctrine that where the power is given to the county authorities to effect a given end, the power to contract for the means whereby the end is to be effected is implicit; and also that the details of such contracts, except so far as the law or public policy prescribes or prohibits some particular form, are left to their discretion. Therefore the county commissioners of Floyd county, being vested by statute with the jurisdiction of building and repairing bridges, and therefore with the implicit power to build them and repair them in such manner and under such form of contract as their discretion might dictate, were authorized to make the contract in question, unless there is something in the law or the public policy of this State forbidding this form of agreement, or prescribing some other.

2. We come, therefore, to the determination of whether this contract violates any law or public policy. We are cited to no statute containing any such limitation. It may be mentioned that the question of letting the contract for the actual performance of the work, which under the law must be done by public bidding, is not involved. The Supreme Court, in *County of Tattnall* v. *Newton,* 112 *Ga.* 780, in discussing the method by which public bridges may be erected, quotes the section of the Political Code (§ 602) conferring upon the county authorities the power to make suitable provision for their erection and repair, "by letting them out to the lowest bidder, by hiring hands, or in any other way that may

be for the public good and agreeable to law," and says, "What broader authority for obtaining and keeping in repair public or county bridges could be afforded?" The court then proceeds to approve the method known as the "Tattnall Plan," by which individual citizens contribute a portion of the work or material and the county authorities the remainder. We think that the question before us (to translate it into the words of the statute) may be stated thus: Is it in accordance with the public good that the county authorities who desire to erect or repair a bridge located near a mill site should make a contract with the owner of the fee and the mill privileges, whereby the work is to be done at joint expense and the resulting structure is to be devoted to joint use? We shall not discuss the unquestioned authority of that line of cases holding that a public corporation can not, under the guise of making public improvements, give aid to purely private enterprises; for that is not involved; it is conceded that in the present case the county authorities have no such ulterior object in view. As viewed from this aspect, the question is whether a public corporation is forbidden to make a contract, whereby the public good may be effected and public expenses economized, merely because some private individual may also thereby obtain a benefit not shared by the public. When we consider the large number of actual instances wherein the public and individuals are making joint expense and the resulting structure is to be devoted to public roads and bridges are maintained over mill-dams and races, we are surprised that the books do not contain more adjudications on this subject. In our investigation we have come across two mill-dam cases. In the first (Windsor *v.* Field, 1 Conn. 279) a committee appointed by the county court to lay out a highway had reported that the road should run across the mill-dam of Haskell & Dexter, but that there should be reserved to them the right of maintaining the dam and of altering and repairing it and the flue when necessary; and, the point being made that such a report was contrary to law, the Supreme Court of Connecticut said: "The committee were bound by their oath to perform the service assigned them 'according to their best skill and judgment, with most convenience to the public and least damage to private property.' If consistent with the public easement or right of way, therefore, and nothing appears to the contrary, the leaving Has-

kell and Dexter to enjoy the right of repairing their mill-dam and
flue when necessary, without being chargeable in such case with
erecting a nuisance, was not only warrantable but a duty." In
the other case (Tatnall v. Shallcross, 4 Del. Ch. 634) it was de-
cided that where a public road crossed a mill-dam which had been
kept at the joint expense of the county and of the proprietor, and
the dam broke, an injunction should be granted to prevent the
county authorities from proceeding to reconstruct the road upon
piles so that it would be available for the purposes of the road but
not of a dam. These are the only two mill-dam cases we have
been able to find touching this question. In other cases, however,
we find the right of the public authorities to make mutually bene-
ficial contracts with private persons sustained. In upholding the
right of a public corporation to make a contract with a private
individual, wherein the corporation received a financial benefit
and the individual obtained the use of a public instrumentality
such as was not shared by other citizens, Justice Brewer, in the
case of City of St. Louis v. The Maggie P., 25 Fed. 204, gives
this view of the question: "When it [the public corporation] has
in its possession instrumentalities, and hires employees for the
purposes of discharging some public duty, I see no reason why,
when the exigencies of public duties do not require the use of those
instrumentalities and employees, it may not make a valid contract
to use them in some private service. Thus, take the fire depart-
ment. The city, having its engines and firemen, might make a
valid contract with me to pump water out of a cellar, and compel
me to pay for this service. The contract is binding on the one
side as well as on the other, and there would be a liability on its
part for the non-performance—except so far as performance was
interfered with by the exigencies of public duty, as by the sudden
occurrence of a fire. Take the public-school system. The city
builds its public-school buildings, employs its teachers, paying
therefor by means of taxation. Now I see no reason why the city
might not say to one living outside the city, 'You may send your
children to one of the schools for a stipulated sum.' In respect
to such a matter the city would be keeping a private school, as it
were,—rendering private services,—entitled to all the benefits and
subject to all liabilities of a private contract. And, generally
speaking, when public duty does not interfere with private serv-

ice, a city may make a valid contract for the use of its instrumentalities in the latter." The Supreme Court of Massachusetts, in the case of Worden v. New Bedford, 131 Mass. 24, in holding that a public corporation might let out such portions of its public buildings as were not needed in the public service, used this language: "But the defendant contends that a city or town has no power to let its public buildings for private uses, that the letting to the poultry association, if made by the city, was ultra vires, and therefore it is not liable. The ground is untenable. The city could not erect buildings for business or speculative purposes, but, having a city hall, built in good faith and used for municipal purposes, it has the right to allow it to be used incidentally for other purposes." It is true that in State v. Hart, 144 Ind. 107, there is a ruling to the contrary. The decision in *Hunnicutt* v. *Atlanta,* 104 *Ga.* 2 (which we see cited also as an authority to the contrary), was merely that where the county court-house was already concededly too small for the accommodation of the county officials, the city could not contract to rent or buy an interest therein; and that decision is, therefore, not in point. A case very closely cognate to the one at bar, is that of City of Coldwater v. Tucker, 36 Mich. 474, wherein the court held: "The general doctrine is clear, that a municipal corporation can not usually exercise its powers beyond its own limits; and if it has in any case authority to do so, the authority must be derived from some statute which expressly or impliedly permits it. The query is suggested, whether even by contract, a city can build or possess public works beyond its limits without plain permission of the legislature. The authority of a city to provide sewerage beyond the city limits may be implied from the existence of a state of facts which renders it actually necessary or manifestly desirable, as where a city, though bounded by a stream, is required by its charter to preserve the stream from pollution and prevent the depositing of filth therein, and no other outlet is reasonably available except through means of ditches extending beyond the limits. And where the drainage requires an outlet beyond the city limits, and the surroundings are such as to raise the implication of authority in the city to conduct the work beyond its limits, the city must be permitted to retain some discretion as to the arrangements by which it shall accomplish the purpose; and there is no legal obstacle to its under-

taking to do this work by its own servants or contractors, instead of employing the owner of the premises to do it. A city thus situated, having led its sewer to the city limits, where it emptied into a county ditch, which was found to be inadequate, made a contract with the adjoining proprietor to enlarge and straighten the ditch through his premises, so as to provide for carrying off all the water without overflowing or saturating his land, agreeing to keep the ditch in repair, not to injure or obstruct the cross ditches, and to maintain a good bridge across it on his premises; . . the work undertaken by the city could not be regarded as repugnant or foreign to the purposes of its charter, and the contract was not beyond the corporate powers." A contract between a city and a county providing for joint use of a jail, the city contributing the land on which it was to be built, was sustained in *Bacon* v. *Walker, 77 Ga.* 336, 339; but we concede that this case is not necessarily in point, since it may be distinguished on the ground that both contracting parties were public corporations.

We have somewhat repressed the view of this case, that the contract taken in its entirety merely amounts to a conditional dedication or sale by Wright, the landowner, to the county of the easement or right to erect the bridge, because there was some slight question made in the record as to whether the county did not already have the easement, by prescription. If it is permissible to view the contract as a dedication on condition, it will be easy to cite authority to sustain it. In this respect the New York case of Hughes *v.* Bingham, 17 L. R. A. 454, is in point. The landowner in that case dedicated a highway on condition that it should be used for seven months in each year, and closed for five. In sustaining the dedication and the condition the court says: "The capacity to take a grant in fee for highway purposes must, upon every just principle of construction, as well as upon reason, growing out of the necessity of the case, be deemed to include the power and capacity to take an interest less than the fee, or upon such conditions as are inserted in the deed." We may also cite the Iowa case of Agne *v.* Sutsinger, 36 L. R. A. 701, in which it was held that when a landowner granted the easement for a highway on condition that he might have the right to join his fences to a bridge, which it would be necessary to build over a creek, so that his cattle might pass under, the road authorities could not disre-

38

gard this right. There is also the case of Hunsicker *v.* Briscoe, 12 La. Ann. 169, in which it was held that the parochial authorities may, in order to avoid expense in the appropriation of property, authorize the owners of the soil over which a road passes to keep up gates, whereby the right of way may be secured to the public with least injury to the owners. See also *B. & W. R. Co.* v. *Waycross,* 91 *Ga.* 573. If the contract in question required the county authorities to perpetually maintain the bridge, a more serious question might be presented; but as we construe it merely to give Wright the privilege to join his dam to the piers so long as the bridge is maintained, no such proposition is before us.

We can not, in light of the record, hold that the contract is contrary to public policy, for that the erection of the dam would tend to injure and impair the usefulness and safety of the bridge for public travel; because evidence was submitted on this issue, and the trial court found to the contrary. While we do not think that public policy would allow the county authorities to barter away the safety of the highway, still, in the nature of things, much must be left to the discretion of the local authorities in determining what will or what will not be safe. We hardly think that the mere fact that the public convenience might be slightly discommoded in times of freshets and unduly high water would be sufficient ground for declaring the contract void. The inconvenience must be substantial. Nor is the fact that the dam may cause it to be more expensive to maintain the bridge a reason for declaring the contract invalid. This feature relates to interest of the county in the bridge, as distinguished from that of the public; and as to such interest the county commissioners have the power to contract. This distinction is brought out in the case of *Justices* v. *Plankroad Co.,* 9 *Ga.* 486, as follows: "The easement in a public road is a property, in equity, belonging to the county at whose expense it is constructed. It is subject to use by the public at large—hence, as I before have said, it appertains to the public. Yet this is not inconsistent with the idea of an equitable interest or property in the county. The public use may be considered as a limitation upon the property. The interest which a county has in a public highway springs equitably out of the fact that that county, and not the whole public, have paid the costs of construction. The right to lay out and open the road is derived from the inferior court, acting

under the legislature. The easement is a legislative grant. The people of the county make the grant available by the outlay which is necessary to open the road; and, so long as the grant is unrevoked, the road,—that is, the easement,—is an interest or property in the county. The inferior courts are the depositories of this property, as well as any other. It is their duty to protect it, as much so as to protect the court-house, and if it is violated, they have the right, as the agents or trustees of the county, to go into a court of equity for redress." On this particular phase of the question the case of *Hanbury* v. *Woodward Lumber Co., 98 Ga.* 60, is squarely in point. Certain citizens residing in West End, Atlanta, attempted to enjoin the Woodward Lumber Company from laying, with the permission of the municipal authorities, a·private railway track across a public street, in which the lumber company owned the fee, the contention being made that the track and the moving of cars thereon rendered the public use of the highway inconvenient and unsafe. The Supreme Court said: "To what extent the owner of the fee may appropriate to his own use those other incidental rights not conflicting with the public use, is necessarily a matter resting primarily with the city authorities, and is referable to the broad discretionary powers conferred upon them in the conduct and management of the public ways. He may be permitted to lay gas and water pipes or drains under the roadway, and do many other acts for his own advantage, provided the use of the public is not impaired. Whether or not such uses could be enjoyed without prejudice to the public right is, as we have said, primarily a matter for the consideration of the city authorities, and if they conceive that the proposed right of the abutting lot owner may be safely exercised without exposing to inconvenience or jeopardy the easement of the public, an injunction against the exercise of such right, at the suit of private citizens not owners of property abutting upon the portion of the street sought to be devoted to the particular private use, will not be granted. In respect to this matter the authorities represent the public and their consent is a sufficient warrant for upholding the judgment, that the entry of the owner of the fee was not per se wrongful. In the present case the parties sought to be enjoined were, the one a railroad company, the other a manufacturing company. They owned lots. opposite each other and abutting on the street in question. The

latter desired the construction of a spur track so as to connect the two lots and thus give it connection with the other company's railroad. They each agreed to this, and the municipal authorities consented, by resolution declaring that the public would suffer no inconvenience from the construction of the proposed track. We think, inasmuch as the city authorities held only an easement to the extent of a right of way, that there was no abuse by them of their discretion in allowing the owners of the fee the uses of the street for the purposes above mentioned. It was a valuable right to the owner of the lot. Proper precautions were taken to protect the interests of the public, and there is no reason why he should have been deprived of that right. Of course, we can not undertake to say that the proposed track may not hereafter, either because of the manner of its construction or the manner of its use, become a nuisance and subject to abatement as such. An increase in population or travel may bring about such a result. But under the present record, we hold that in favor of the owner of the fee in the street the city authorities had the power to authorize a joint enjoyment of the property, and that their discretion was not abused when it was determined that the proposed use by the owner of the fee was not inconsistent with the exercise by the public of its dominant right of way."

We have been led into this lengthy discussion of this case not only by the able and earnest arguments which were presented pro and con, but also on account of the public character of the interesting questions involved; and, after considering the matter in its various phases, we hold that the contract is legal and that the judgment rendered is correct.

*Judgment, on the main bill of exceptions, affirmed; cross-bill dismissed.*