### GARRISON *et al. v.* PERKINS *et al.*

1. Any county in the State may make requisition for its quota of the male convicts to be employed upon the public roads of the county, and it is competent for the county authorities having charge of the roads and revenues of the county to levy a tax to defray the expense incurred in the maintenance, keeping, and equipment of the force of hands obtained from the State

2. County authorities having charge of the roads and revenues of a county can not build bridges of the character referred to in § 387 of the Code (1910), except by letting out the contract therefor according to the provisions of §§ 387 et seq.

3. Where the ordinary of a county, having charge of county matters, bought steel and other material and used the same in the construction of bridges of the character just referred to, the purchase-price of such material was not a valid charge against the county which could be enforced by the vendor of the material.

(*a*) And where money was borrowed from another person to pay for such materials, it was not competent for the ordinary to levy a tax whereby to raise funds to repay such loan.

4. The court did not err in allowing and directing an amendment of the tax levy; but in the present instance the amendment was not sufficiently specific.

5. Where the ordinary has advertised a copy of the order containing the tax levy at the door of the court-house for the time prescribed by the statute, failure to publish the same in a public gazette will not render the levy void.

6. Under the evidence in the case, the court was authorized to find that the ordinary had not been guilty of any illegal act in renting the farm upon which to work the convicts.

7. Whether the tax levy, as it will stand when amended, will be exorbitant will be a question of fact to be decided under the evidence to be submitted on the next hearing of the case.

MARCH 2, 1912.

Petition for injunction. Before Judge Brand. Banks superior court. March 3, 1911.

J. M. Garrison, B. F. Suddeth, and F. M. Henderson filed their equitable petition against Logan Perkins, ordinary, and George W. Wiley, tax-collector of Banks county, seeking to enjoin the enforcement of a certain tax levy, and also to enjoin the payment of certain money to the Atlanta National Bank. At the hearing the following statement of facts agreed upon by both parties was introduced in evidence:

"1. It is agreed that the County of Banks has not adopted any of the alternative road laws.

" 2. That the county affairs are managed by the ordinary.

"3. That Banks County, through her ordinary, has requested and obtained her share of the State convicts, in accordance with the acts of 1908, averaging about twenty (20) convicts per annum, with misdemeanor convicts.

"4. That the four (4) bridges referred to in the defendants' answer cost about four thousand ($4,000.00) dollars. That the material, such as steel beams, lumber, etc., were purchased by private contract, by the ordinary, the material for each bridge costing over three hundred ($300) dollars. The bridges were built by said ordinary, by the use of the convict labor, together with one superintendent. No contract for the erection of any of said bridges was made or let to the lowest bidder, and no contract for the building of said bridges was entered on the minutes of said ordinary, and no order of any sort was entered on said minutes regarding the purchase of any material; the only orders on the minutes relating to the bridges being the orders set forth in the answer relative to borrowing money to pay for the same. The money borrowed from the Atlanta National Bank, and now due said bank, was used in part to pay for said bridges mentioned. The greater portion of the sum of three thousand, eight hundred and thirty-seven ($3,837.00) dollars, set forth in defendants' answer as having been paid out for public improvements, etc., during the year 1910, was paid out on the four bridges above referred to. There is still due the Onego Bridge Co. one thousand, two hundred dollars, balance for the steel bridge mentioned as being one of the bridges.

"5. It is further agreed that the cost of the convicts for the year 1910, including guards, feed, clothing, tools, etc., amounted

to the sum of $6,229.34, and that this cost was paid out of the money borrowed from the Atlanta National Bank, during the year 1910, and for which sum said bank holds the obligations of Banks County, as set forth in said petition and answer.

"6.. It is further agreed the expense of court, county officers, paupers, coroners, etc., amounted to the sum of $7,092.00, which has been partly paid from the funds obtained from the Atlanta National Bank, and partly from the taxes raised for such purposes during the year 1910.

"7. It is further agreed that the tax levy of September 29, 1910, item 2, of seventy cents on the one hundred dollars, will amount to about $12,000, and is intended to be used by the ordinary to pay for some small repairs on the court-house and jail, to pay the sum of $1,200 due for said steel bridge material, and the balance to repay the Atlanta National Bank the sum of $3,837.07 expended on bridges, etc., and $6,229.34 expended for the care and use of convicts, as set forth in the defendants' answer, and any other expenses that may be chargeable to said item 2."

Affidavits were introduced by the plaintiffs to show that certain work done upon the roads of the county as extraordinary work was not work of that character, within the meaning of the expression "extraordinary work," as used in the statute; and affidavits were introduced by the defendants to show that the work classed by the ordinary as extraordinary work was of the character claimed, and that other work which the ordinary had had done by convict labor was in the nature of public improvements; and to show that certain roads which were opened up and worked out were a public utility. The tax levy brought under review by the petition is included in an order passed September 29, 1910, and the levy is as follows:

"Item 1. 10 cents on the hundred dollars to pay the legal indebtedness of the county due or to become due during the year.

"Item 2. 75 cents on the hundred dollars to pay for building and repairing bridges, court-house, jail, or other public improvements.

"Item 3. 1 cent on the hundred dollars to pay sheriff's, jailor's, or officers' fees that may be legally entitled to, etc.

"Item 4. ½ cent on the hundred dollars to pay coroners all fees that may be due them by the county for inquests.

"Item 5. 1 cent on the hundred dollars to pay the expenses

of the county for bailiffs at court, non-resident witnesses in criminal cases, fuel, servant's bill, stationery, etc.

"Item 6.   1 cent on the hundred dollars to pay jurors per diem compensation.

"Item 7.   5 cents on the hundred dollars to pay expenses incurred in supporting the poor of the county.

"Item 8.   ½ cent on the hundred dollars to pay charges for educational purposes, to be levied only in strict compliance of the law.

"Item 9.   6 cents on the hundred dollars to pay any other lawful charges against the county."

It is contended that the levy is void upon the following grounds, among others:   (1) Because said tax levy does not specify the per cent. levied on the State tax for each specified purpose enumerated therein.   (2) Item 2 is void for the reason that it fails to specify the per cent. levied upon the State tax; further, because it does not purport to be levied for the items mentioned according to the language of the code, in that it omits the words "according to contract."   (3) Because the levy of seventy-five cents on the hundred dollars is an exorbitant tax, and an unnecessary tax and in violation of section 505 of the Code of 1910.

After the hearing upon the pleadings and the evidence, the court below rendered the following judgment:   "It is ordered that the injunction prayed for enjoining the ordinary from paying the amount due the Atlanta National Bank is refused; and the restraining order heretofore granted, restraining the ordinary from paying the amount due said bank, is hereby dissolved.   Being of the opinion that the ordinary was authorized to levy a tax for the purpose of building and repairing bridges and for the purpose of maintaining the convicts on the roads of the county, but that the levy for this purpose should have been more specific than as set forth in the levy as made, it is ordered that item 2 of the tax levy, as exhibited to the petition, be amended by the ordinary, so as to specify in different items the amount that is to be collected for each of the items set forth therein, not changing the aggregate of said item, to wit, seventy-five cents on the one hundred dollars; that is to say, let the item show how much of this aggregate amount is to be used for building and repairing bridges, how much for courthouse and jails, and how much for other public improvements, such

as the work of convicts upon the roads, and the like. When the item of the tax levy above referred to is amended as herein directed, the above injunction, praying that the tax-collector and the ordinary be enjoined from collecting the taxes due by the plaintiffs in the petition, be and the same is hereby refused and the restraining order heretofore granted, restraining the collection of the taxes due by the plaintiffs, is hereby revoked and set aside. It is further ordered that the restraining order heretofore granted is hereby revoked so far as it applies to any part of the tax levy, except that embraced in item 2 of said levy, and is revoked as to said item when the same shall have been amended as herein provided." This judgment was excepted to upon the ground, among others, that the court was not authorized to allow the ordinary to amend his tax levy.

The ordinary amended item 2 in pursuance of the order of the court; and as amended that item reads as follows: "Item 2. 75 cents on the hundred dollars to pay for building and repairing bridges, court-house, jails, or other public improvements. The amount embraced in this item shall be divided and apportioned among the different subjects embraced herein as follows: Repairing court-house and jail, 2 cents. Building and repairing bridges by letting out to lowest bidder, by hiring hands, by purchase of material and use of convicts on the county chain-gang, or in any other way that may be for the public good and agreeable to law, 50 cents. Extraordinary work on the public roads, which can not be done by the road-hands subject to road duty, such work to be done by the use of convicts on the county chain-gang or otherwise, as may be to the best interest of the county, 23 cents."

Other exceptions, in so far as they are material, are referred to and discussed in the opinion.

*H. H. Dean*, for plaintiffs. *A. J. Griffin, Howard Thompson, and Cobb & Erwin*, for defendants.

BECK, J. (After stating the foregoing facts.) The most important question in this case grows out of the attack made upon the validity and the sufficiency of item 2 of the tax levy brought into consideration, and the issue which is joined by counsel for the defendant upon the attack made. The right of the county of Banks to take over its quota of convicts under the provisions of the act of the General Assembly relating to the employment of convicts, approved September 19, 1908, hereafter referred to as the

act of 1908, and to incur the necessary expenses for the maintenance and use of the force of convicts acquired under the provisions of that act, is brought into question. Neither at the time of making the requisition for the convicts nor subsequently thereto was either of the alternative road systems in force in this county. The system of working the public roads which prevailed prior to the adoption of the alternative road law, which for convenience may be called the old system, prevailed in Banks county at the time of its requisition for its share of the convicts; and it is contended by counsel for the plaintiffs that the county, not having adopted either of the alternative road laws, was without authority to take the convicts under the provisions of the act of 1908 and incur expense in connection with their use upon the public roads and bridges or in other public works of the county. On the other hand, counsel for the defendants insist that the act of 1908 worked an entire revolution in the system of working the roads in any county which might make requisition for its quota of convicts, irrespective of the system of working the public roads prevailing in the county at the time of making the requisition. We differ entirely with the views of counsel for the plaintiffs upon this subject. And while we do not agree with counsel for the defendants that the act of 1908 worked an entire revolution in the prevailing system for working public roads in any county making requisition for convicts, we do think that any county in the State, whatever its road system might be at the time, could make requisition for convicts under the provisions of the act of 1908, and, having obtained the convicts in accordance with its application, could employ them conformably to the purposes of that law, keeping in view other laws upon our statute books which relate to the same subject and matters germane thereto. Treating the statute embodied in the act of 1908 as applicable to Banks county and its system of working the public roads, this statute and those already in force, relating to kindred subjects, must be construed together. In the act of 1908 we find the following provisions: "That all male felony convicts, except such as are now required by law to be kept at the State farm, may, after March 31st, 1909, be employed by the authority of the several counties and municipalities upon the public roads, bridges, or other public works of said counties or municipalities as hereinafter provided. On or before the tenth day of February, 1909, and annually thereafter,

prior to the tenth of February the prison commission shall communicate with the county authorities of the State and ascertain those counties desiring to use convict labor upon their public roads, and said counties shall, through their proper authorities, advise the prison commission in writing, stating whether they desire to use such labor upon their roads, and the number desired. . . That any county may purchase, rent, and maintain a farm upon which to work any number of its convicts in connection with working its convicts upon its public roads, bridges, and other public works, and in support of the county institutions." The language employed in the portions of the act we have quoted shows that it was the plain purpose of the legislature that any county might obtain convicts to be employed by it, upon its roads, bridges, and other public works. The expression " any county " means every county in the State, and its effect is not limited to counties having any particular system of road laws. There is nothing in the act which seems to contemplate that any plan of working the public roads of a county taking convicts from the State, which might be in force at that time in the county, should be destroyed or abandoned. Such a construction as that would result, possibly, in some counties in the entire neglect for years of many of their roads. In case a county could obtain but a small number of convicts, because of demands made by other counties for their quotas, and such county had a large number of roads, it would be possible that the greater part of the roads could not be worked and rendered fit for use for a long period of time. But certainly the act contemplated a step forward in the improvement of our public-road system, and intended to put it in the power of every county to make progress in the direction of maintaining safe and available highways. The main purpose of the act, as shown by its title, is " to provide for the future employment of felony and misdemeanor male convicts upon the public roads of the several counties of the State." While this act may not be a tax act, strictly speaking, it gives, in unmistakable terms, certain rights to any county desiring to use convict labor upon its public roads, and in language equally unambiguous it imposes certain correlative duties; and from the plain language conferring those rights and imposing those duties follow certain necessary implications. Among the necessary implications from the language in reference to the employment of convict labor upon the

public roads by the counties is, that measures must be taken which are indispensable to effectuate the purposes of the act in any county claiming the benefits of the act. Road machinery, tools, camps, a farm, such as is referred to in section 9 of the act, would have to be procured; material would have to be purchased to be used in building up and improving the roads. Of course the quantity, quality, and character of the tools, implements, machinery, and materials procured would necessarily rest largely in the discretion of the proper county authorities, varying in amount, character, and cost, according to the needs of each county, and depending in a large measure upon the character of the roads and the number of convicts employed. If, under the provisions of this act, the counties have the rights and the corresponding duties which we have indicated above, it would seem to follow that they would have the power to raise by taxation the funds necessary to defray the cost incurred in procuring and maintaining the equipment indispensable to the effective employment of the convicts. In the case of *Pennington* v. *Gammon,* 67 *Ga.* 456, it is said: "Under various acts of the General Assembly of this State, the last of which was passed in the year 1879, any county may organize a chain-gang to be composed of convicts, who may be employed in working the roads, streets, or · on other public works. The power to make provision for their support, safe-keeping, and *for their constant and diligent employment,* was vested originally in the ordinaries of the counties, but now in the commissioners of roads and revenues wherever they have been provided for: Code, §§ 4814, 4815; Acts 1874, p. 24; Acts 1878-9, p. 167. By virtue, therefore, of the duty imposed, a correlative right exists, even if not specially empowered, in these commissioners, not only to levy taxes for the support of these convicts, but to provide means for their doing the work specified, and *for their constant and diligent employment* therein." We have been asked to review and overrule the *Pennington* case, but it seems to us that the conclusions reached embody a sound principle of law, and should be permitted to stand. "If what the law requires to be done can only be done through taxation, then taxation is authorized to the extent that it may be needed, unless it is otherwise expressly declared. The power to tax in such cases is not an implied power, but a duty growing out of the power to contract. The one power is as much express as the other." Ralls County Court *v.* U. S.,

105 U. S. 733 (26 L. ed. 1220). "Neither counties nor municipal corporations of any character possess this power [the power to tax] to any extent unless conferred by the constitution or the laws of the State, and therefore such power can only be exercised when delegated in plain and unmistakable terms, or when it results by necessary implication from other powers expressly granted." *Albany Bottling Co.* v. *Watson,* 103 *Ga.* 505 (30 S. E. 270). See also, in this connection, *Wright* v. *Floyd County,* 1 *Ga. App.* 582 (58 S. E. 72). Section 654 of the Code (1910) provides: "The county authorities of the several counties, having charge of the roads and revenues of each of said counties, are authorized and required to provide for the grading of the public roads of their respective counties, where said roads are too steep, too rough, or too boggy for practical use or the hauling of ordinary loads; and said officials are authorized and required to provide for any other extraordinary work on the public roads of their respective counties which can not be done by the road hands subject to road duty under the laws of this State." And section 655 provides: "Said officials may have said work enumerated in the preceding section done by use of the county chain-gang, by contract let to the lowest and best bidder, or otherwise as may be to the best interest of their respective counties; and said officials shall be authorized to pay for said work out of any funds of their said counties not otherwise appropriated." These two sections are taken from the acts of 1880-81. Subsequently it was enacted, that, "on the application of one or more citizens of any county of this State against the county commissioners of roads and revenues of such counties where by law supervision and jurisdiction is vested in such board of commissioners of roads and revenues over the public roads of such counties and the overseers of the public roads complained of, or the ordinaries of such counties where by law supervision, control, and jurisdiction over such public roads is vested in the ordinaries and the overseers of the public roads that may be complained of, either, both, or all of said named parties, as the facts and methods of working the public roads in the respective counties may justify, which application or petition for mandamus shall show that one or more of the public roads of such county of such petitioner's residence are out of repair, and do not measure up to the standards and do not conform to the legal requirements as prescribed by sections 632,

633, and 654, and are in such condition that ordinary loads, with ordinary ease, can not be hauled over such public roads, the judges of the superior courts of this State are hereby authorized and given jurisdiction, and it is hereby made their duty, upon such showing being made, to issue the writ of mandamus against such parties having charge of and supervision over the public roads of such county, and to compel by such proceedings the building, repairing, and working of such public roads as are complained of, up to that standard now required by existing laws of this State as embodied in said sections, and so that ordinary loads, with ordinary ease and facility, can be continuously hauled over such public roads; and the judges of the superior courts shall, by proper order, in the same proceedings compel the work done necessary to build, repair, and maintain such public roads up to the standard so prescribed." Civil Code (1910), § 5441. Construing these two sections together, it would seem that, independently of the act of 1908, it is the imperative duty of the county authorities having charge of county affairs to do such work on the public roads as might be denominated extraordinary work. And if such extraordinary work was necessary and there were no funds in the county treasury "not otherwise appropriated," funds necessary to the doing of the extraordinary work might be raised by taxation to meet the necessary expenses incident to the doing of such extraordinary work. But whether construing §§ 654 and 5441 together would authorize this conclusion, certainly when sections 654 and 5441 and the act of 1908, authorizing the employment of convicts, are construed together, no other conclusion can be reached than that the funds needful to carry out such work can be raised by taxation. Otherwise we would have a distinct provision in our code making it the duty of the superior court to issue a peremptory order, upon a proper showing and proof supporting that showing, to the authorities having in control the matter of working the roads to do certain work, and yet leaving those authorities, where no funds were in the treasury of the county unappropriated, without the means of purchasing material and taking other necessary measures to effectually do the work which they might be ordered to perform. We have referred to sections 654 and 5441, in connection with the act of 1908, as strengthening the reasoning which leads to the conclusion, that, while in none of the sections last referred to nor in the act of 1908 is there expressly

given the power to tax, the taxing power to accomplish the purpose of the statutes last referred to is necessarily implied. But the work upon which the convicts may be employed under the act of 1908 is not confined merely to the doing of "extraordinary work" upon the public roads, in the sense in which the term "extraordinary work" is used in section 654.

Thus far our opinion coincides, in the main, with the position taken in this case by counsel for the defendants. But we can not go to the extent of holding that the ordinary of Banks county was authorized to purchase the necessary materials, such as steel, timber, and cement, and from them, by the employment of convict labor, construct bridges which, under the provisions of sections 387 et seq. of the Code (1910), must be built or repaired by letting out the contract therefor to the lowest bidder, or in accordance with "sealed proposals" invited under the provisions as to specifications, etc., required by the section last referred to. Section 387 reads as follows: "Whenever it becomes necessary to build or repair any court-house, jail, bridge, causeway, or other public works in any county in this State, the officer having charge of the roads and revenues and public buildings of such county shall cause the same to be built or repaired by letting out the contract therefor to the lowest bidder, at public outcry, before the court-house door, after having advertised the letting of said contracts as hereinafter provided: Provided, that such county authorities shall have authority to reject any and all bids at such public letting; and if in their discretion the public interest and economy require it, such county authorities may build or repair any public buildings, bridges, causeways, or other public property in the county, by contract or sealed proposals, to be invited under the same provisions as to specifications and like informations as are provided in the following sections." The requirement of this statute, that the building of any bridge or other public work shall be by contract let out as provided in this and the following sections, is mandatory. It is insisted that the word "shall," where it appears in section 387, can be construed as "may" and should be so construed in order to reconcile the language of that section with section 747 of the Code (1910), which contains the following language: "The ordinaries of the several counties have authority to appoint the places for the erection of public bridges, county ferries, turnpikes, and causeways,

and to make suitable provision for their erection and repairs by letting them out to the lowest bidder, hiring hands, or in any other way that may be for the public good and agreeable to law." It is insisted that these two sections must be construed in pari materia, and that they may be harmonized by construing " shall " as " may " in section 387. While it is sometimes permissible to substitute " may " for " shall " in the construction of statutes, it is not permissible to so construe the word " shall " in the present instance. Section 387 is taken from the act of 1879 (Acts 1878-9, p. 159), which is entitled "An act to regulate the manner of letting out contracts to build or repair public buildings, bridges, causeways, or other public works in the several counties of this State," etc. But the body of the act (and the code section) contains the language which we have quoted above, which not merely regulates the manner of letting out contracts but commands that in the instances specified bridges and other public works shall be repaired or built by letting out the contract. In view of the evils which it is probable the legislature had in view as a possible result of erecting bridges and other public works without letting out contracts therefor after due publication, it can scarcely be doubted that by the use of the word " shall " a legislative mandate, and not a mere permission, was imported into this statute. Besides, in its ordinary signification " shall " is a word of command, and the context ought to be very strongly persuasive before that word is softened into a mere permission. And moreover, the substitution of " may " for "shall" in that part of section 387 now under consideration is not necessary to the harmonious construction of the two statutes embraced in §§ 387 and 747. Section 747 is taken from an older act than § 387, and it is insisted that § 387 repeals § 747. But if both sections can stand, both having been embodied in the code, they should be allowed to do so and that construction be adopted which destroys neither. It may frequently happen that bridges are to be built in connection with the public roads which do not cost $300. Such bridges may be built under provisions made by the proper county officers, " by hiring hands, or in any other way that may be for the public good and agreeable to law,"—using words taken from § 747. And under the construction which we have given the act of 1908, instead of hiring hands, the county officers having in charge the public roads of the county may, in connection

with other work upon the public roads, employ convict labor in building and repairing the bridges which cost less than $300. This construction does no violence to either of the two sections last under consideration, and has the effect of harmonizing those two sections and leaves the mandatory provisions of § 387, providing that bridges shall be built by letting out the contract therefor, to stand unimpaired. With those provisions in § 387 thus clearly defined, it necessarily follows that the ordinary of Banks county was without authority to construct bridges costing over $300, by purchasing steel and other material from which to construct such bridges by the use of the labor of the convicts. His contract for the purchase of this steel and other material was unauthorized by that law; and those who sold the steel and other material to him could not enforce, as against the county, a contract for the purchase-price of the same. We do not think that the persons furnishing the steel and material for the building of such bridges as referred to in § 387 would stand in any better position than contractors building or repairing bridges where §§ 387, 388, and 389 (Civil Code of 1910) have not been complied with, and the law expressly declares: "And it shall be unlawful to let out any contract for building or repairing any public building, bridge, or other public work, unless the provisions of these sections are complied with; and any contractor doing, or having done, any work of the kind in any other manner shall not be entitled to receive any pay therefor." To hold that materialmen and manufacturers of material to be employed in the construction of bridges or other public buildings could, without respect to the strict provisions of the statute, furnish materials of their manufacture to the ordinaries of the various counties of the State and collect for the same, and that the ordinaries could use such materials in the building of bridges and other public buildings by hiring hands or the employment of convicts, would enable the ordinaries or other officers having control of public roads and county matters to erect whatever public structures they saw fit, and the taxpayers of the county would be subject to a tax levy ordered to defray the cost of such structures. This would in effect wipe from the statute books § 387, with its wise and salutary provisions which secure, among other benefits, competitive bidding for the erection of public buildings, bridges, etc., coupled with the no-

tice, contemplated by the statute, to be given to the public and those who may be interested, which might have the effect to check extravagance upon the part of officers having in charge the county revenues, and the further effect of preventing other evils plainly in contemplation of the lawmaking body at the time of the passage of the act of 1879.

It follows from what we have said above, that the expense necessarily incurred in the keeping, maintenance, and equipment of the convicts is a valid charge upon the county, and that it was legal for the ordinary to levy a tax to raise the money to meet that obligation; but that a claim against the county for the purchase-price of steel and other material for the bridges erected by the ordinary, which cost as much as $300 or more, is not a valid claim against the county. No question is made in the pleadings as they stand that it was competent for the ordinary to pay so much of the loan from the Atlanta National Bank as had been used in the discharge of valid claims against the county; and in the brief of counsel for the plaintiffs it is distinctly conceded " that the question as to whether the Atlanta National Bank should be enjoined depends upon the legality of the tax levy. . . If the money was properly expended, the bank should be reimbursed; if the money was illegally expended, it was an illegal debt and the citizens can not pay the taxes for that purpose." This concession is based upon counsel's construction of the decision in the case of *Butts County* v. *Jackson Banking Co.*, 129 *Ga.* 801 (60 S. E. 149, 15 L. R. A. (N. S.) 567, 121 Am. St. R. 244). We do not, however, construe the statement of counsel just quoted as going to the extent of conceding that a loan of money to be used in defraying current expenses (not merely to supply a casual deficiency of revenue) would be a legal charge against the county. For it is distinctly held in the *Butts County* case that " County commissioners have no authority to contract in behalf of a county for a loan of money (not to supply a casual deficiency of revenue) to be used in defraying current expenses, although the notes which evidence the loan be payable within the current year, and the general design be to discharge them from the anticipated revenue of that year." The contentions of the plaintiffs in this regard can be made clear at the next hearing of this case; for the judgment must be reversed be-

cause of the court's refusal to enjoin the tax levy as it stood even after the amendment was made, as it appears in the record.

We do not think that the court erred in allowing the ordinary, by proper order, to amend his tax levy (*Sullivan* v. *Yow,* 125 *Ga.* 326 (54 S. E. 173) ), but in the present instance we do not think that the levy was sufficiently specific after the amendment. Especial attention is called to the second and third subdivisions under item 2, which blend and confuse the tax necessary to build and repair bridges which are to be let out to the lowest bidder with those that may be built by hiring hands, including the "use of convicts on the county chain-gang," the expression, " by the use of convicts on the county chain-gang," occurring in both of these subdivisions. This is confusing, and gives no indication of the rate of tax required by the important item of work on the public roads by the use of convicts, and it does not show what proportion of the tax that will be raised by the levy of 50 cents on the one hundred dollars would be required for bridges which could only be built under contract let out as prescribed in §§ 387 et seq. of the Code of 1910. Before the levy can be enforceable, it must be so amended as to distinctly show for what purposes the tax is to be raised, and be free from the equivocal items that might be broad enough to embrace a tax levy to raise money for purposes which, under this decision, are declared to be invalid and illegal.

Where the ordinary has advertised a copy of the order containing the tax levy at the door of the court-house for the time prescribed by the statute (Code, § 515), failure to publish the same will not render the levy void. We think that the provision for advertising may be treated as directory; but in our opinion ordinaries and other county authorities having charge of the revenues of the county should comply not only with the mandatory requirements of a statute, but, as far as practicable, with those provisions of the statute which can be construed to be only directory, in all cases where measures for raising taxes are concerned. This objection applies also to the failure of the tax levy to show the per cent. upon the amount of the State tax for the year. Sufficient data is given in the levy in the present case to clearly show the per cent. upon the amount of the State tax, but it would have been better to express that per cent. in words and figures.

Under the evidence the court was authorized to find that the ordi-

nary had not been guilty of any illegal act in renting a farm upon which to work the convicts. Acts 1908, p. 1124, sec. 9.

*Judgment reversed. All the Justices concur (Fish, C. J., and Lumpkin, J., specially), except Hill, J., not presiding.*

LUMPKIN, J. I concur in the reversal of the judgment, but regret that I can not concur in all that is said in the opinion of the majority of the court. The point on which I especially disagree with them is that they hold that the act of 1908 confers upon county authorities the power to levy taxes in addition to those previously authorized by law. Acts 1908, p. 1119; Penal Code (1910), §§ 1205 et seq. From this ruling I dissent. There is not a word, either in the caption of the act or its body, directly or indirectly referring to the power of county authorities to impose taxes. Prior to 1908 the State hired out or leased the labor of the felony convicts, under certain regulations. By the act passed in that year it was declared that the prison commission might work certain felony convicts on the State farm; and that others might "be employed by the authority of the several counties and municipalities upon the public roads, bridges, and other public works of said counties or municipalities." Provisions were made for assigning convicts to counties, upon application; for authority on the part of the commission to have work done on roads, etc., on application by counties not taking convicts; for authority on the part of a county to purchase and maintain a farm, in connection with working its convicts; for other matters of regulation; and for conferring upon municipalities the right to hire from the prison commission any number of convicts which might not be otherwise disposed of, at the price of $100 per capita per annum. If this alone authorized an ordinary to levy a tax, which he was not otherwise empowered to do, no limitation was placed upon his action in this regard. Either this act did not confer additional powers of taxation upon ordinaries, or else, by mere implication, it conferred upon them (where they administer county affairs) an unlimited power of taxing the people of their respective counties, to any extent which they might deem proper, in that connection. If the mere conferring of power to apply for, obtain, and work convicts upon the roads, etc., amends the tax laws as to counties, apparently it must also be construed as amending every municipal charter in the State, so as to confer a similar additional right of taxation beyond the present

charter limits, if they should see fit, and be able, to obtain convicts. The general rule is that the power to tax must be clearly conferred, or the property of the citizen can not be burdened with assessments. The enactment by the legislature of a law (not in conflict with the constitution) which declares that a county may do a certain thing places that thing within the range of county activities, but does not alone affect the laws touching the raising of taxes for county purposes. If the legislature desires to confer additional taxing power on the ordinaries, it is for them to do so. Suppose that the legislature should pass an act declaring that counties might build and repair public buildings and bridges, maintain and support prisoners, establish quarantines, work roads, support paupers, have county police, and establish sanitary measures, thus declaring certain legitimate subjects of county administration, but say nothing as to the present tax laws, would such mere declaration operate to confer on the ordinaries unlimited powers of taxation for such purposes?

The decision in *Pennington* v. *Gammon, 67 Ga.* 456, does not control the present case on the point now under consideration. There a county chain-gang was inaugurated, under certain provisions of law. The county commissioners levied a tax for the support and maintenance of convicts or prisoners, but it was found to be insufficient, and they were proceeding to make a temporary loan to supply a casual deficiency. No contest was made as to the tax which had been levied, but injunction was sought as to the making of the temporary loan to meet the deficiency.

I am authorized to state that Chief Justice Fish concurs in this opinion.