# CASES

### DECIDED IN THE

# SUPREME COURT OF GEORGIA

#### AT THE

## OCTOBER TERM, 1921.

---

### CITY OF ATLANTA *et al. v.* SCOTT *et al.*

1. The provision in the charter of the City of Atlanta, " In addition to the ordinary tax herein allowed, the mayor and councilmen and aldermen may, in case of emergency, to be judged of by them, levy an extraordinary tax, not exceeding one half of one per cent. (on the taxable property of said city), the said extraordinary tax to be added to the ordinary tax, and collected at the same time, and used for the same purpose," does not authorize the mayor and council to conclusively determine that an emergency exists, so as to justify the exercise of the charter authority to levy an additional tax. The power to levy such tax is dependent upon the existence of an emergency in fact, and a declaration by the mayor and council that an emergency in a given case does exist is open to inquiry by the courts.
2. The evidence in this case was insufficient to show the existence of an emergency within the meaning of the charter of the City of Atlanta, upon which to base the levy of an additional tax.

No. 2637. MARCH 4, 1922.

Injunction. Before Judge Pendleton. Fulton superior court. April 28, 1921.

The charter of the City of Atlanta provides: " For the purpose of raising revenue for the support and maintenance of said city government, the said mayor and general council shall have full power and authority, and they shall provide by ordinance for the assessment, levy, and collection of an ad valorem tax on all real

1

and personal property within the incorporate limits of said city, not exceeding one and one fourth per cent. thereon, which shall include the school tax, which, under the laws of this State, is subject to taxation; Provided, nevertheless, that all assessments of real property shall be made at the cash market valuation. . . In addition to the ordinary tax herein allowed, the mayor and councilmen and aldermen may, in case of emergency, to be judged of by them, levy an extraordinary tax, not exceeding one-half of one per cent. (on the taxable property of said city), the said extraordinary tax to be added to the ordinary tax, and collected at the same time, and used for the same purpose." City Code of Atlanta of 1910, §§ 121, 124. An ordinance was adopted, January 17, 1921, by the mayor and general council, and approved January 18, 1921, by the mayor, as follows:

" An ordinance levying an emergency tax for forty-five one-hundredths of one per cent., as provided by the charter of the City of Atlanta in cases of emergency, being found in section 124 of the City Code of 1910, and for other purposes. Whereas the charter of the City of Atlanta provides that, in addition to the ordinary tax allowed to be assessed by the Mayor and General Council of this city, such body may, in case of emergency, to be judged of by them, levy an extraordinary tax, not exceeding one-half of one per cent., on the taxable property of said city, said extraordinary tax to be added to the ordinary tax and payable at the same time as the ordinary tax is made payable and in the same installments; and whereas an emergency now exists, in the opinion and discretion of the Mayor and General Council of this city, and in order to meet this emergency it is necessary to use the power granted to this body by said section of said charter, to the extent of levying an extraordinary tax of forty-five one-hundredths of one per cent., for the year 1921 only: Therefore be it ordained by the Mayor and General Council of the City of Atlanta as follows:

" Section 1. That a case of emergency now exists, in the opinion of the mayor and general council; and same is hereby adjudged to exist in the opinion of the mayor, aldermen, and councilmen of the City of Atlanta.

" Section 2. That an extraordinary tax of forty-five one-hundredths of one per cent. is hereby levied on all the real and

personal property within the limits of and subject to taxation by the City of Atlanta, as shown by the returns thereof for the year 1921, upon the tax digests prepared and on file in the office of the city tax receivers and assessors, to be known as an extraordinary tax and to consist of forty-five one-hundredths of one per cent. of the value of said property as shown by said returns, and to cease with the current fiscal year.

" Section 3. That the tax herein provided for shall be and is hereby assessed upon the property now on the tax books of said city, at the value placed thereon for and during the year 1921. The foregoing extraordinary tax, levied as herein provided because of an existing emergency, is hereby made payable at the same time as the ordinary tax is made payable and in the same installments.

" Section 4. That all the usual machinery provided by the charter and ordinances of this city shall be and is hereby applied to the assessment of this tax and the collection of same, and, if not paid on or before October 15th, 1921, all the existing provisions of the charter and ordinances of the City of Atlanta, as to interest, defaults, costs, executions and sales to pay taxes, are hereby ordained and are of force and effect, and shall be used to carry into effect the levy and assessment and collection of the extraordinary tax herein provided for and levied because of an emergency now existing in the City of Atlanta.

" Section 5. That this emergency and extraordinary tax shall be extra and additional to the regular annual tax levy authorized by existing charter and ordinance provisions, and shall be added to the ordinary tax and collected at the same time and used for the same purpose, and same shall end with this levy and with the current fiscal year.

" Section 6.. That in case any persons desire to pay same, as provided by existing charter provisions, such payments shall be allowed, and the first installment thereof shall be payable on or before May 1st, 1921, and the second installment shall be payable on or before July 1st, 1921, and the third installment on September 1st, 1921; and the existing provisions of the said charter and ordinances, with reference to bearing interest on said installments, shall be effective on and after May 1st, July 1st, and September 1st, 1921, as above named, as to the installments unpaid on either of said dates; and the other provisions of the charter and ordinances

governing such installment payments, with reference to discount, etc., are hereby ordained as of full force and effect, and shall be applied as to the payments of the extraordinary tax herein ordained, same being in addition to the ordinary tax levied for the current year 1921.

" Section 7. That the sums raised by the levy of this extraordinary tax, ordained and levied because of an emergency which now exists in the City of Atlanta, in the opinion and discretion of the mayor and general council, shall go into the general fund of the City of Atlanta and shall be used for the same purposes as the ordinary tax is levied.

" Section 8. That all ordinances and parts of ordinances in conflict with this ordinance be and the same are hereby repealed."

On April 21, 1921, the foregoing ordinance was amended by striking out the provision for forty-five one-hundredths of one per cent., and inserting in lieu thereof a provision for a levy of an emergency tax of one eighth of one per cent. The amendment also provided: " That the facts alleged in said ordinance, approved on the date above stated, are hereby reaffirmed, and the mayor, aldermen, and councilmen again state that an emergency now exists and is adjudged to exist in the opinion of said mayor, aldermen, and councilmen, and said extraordinary tax is necessary to preserve the health, order, and general welfare of the City of Atlanta, and that same cannot be preserved during the year 1921 without the levy and collection of the emergency and extraordinary tax provided for in the original ordinance and provided for in this amended ordinance. Since the original ordinance was adopted and approved, a bond issue has been passed by a vote of the people, and this will relieve enough of the current revenue to permit of the reduction to the amount provided by this amendment. The emergency existed at the time of the original ordinance as well as now. The amount necessary to meet the emergency can be and is hereby reduced by reason of the proceeds of the bond issue relieving current income, as above stated, so that this reduction is made possible."

On February 4, 1921, which was prior to the amendment last above stated, Henry B. Scott, B. D. Watkins, Albert S. Adams, and Jonas H. Ewing, as citizens and taxpayers of the City of

Atlanta, instituted an action in behalf of themselves and other citizens and taxpayers, against the City of Atlanta as a municipal corporation, Walter Taylor as city clerk, F. F. Smith as city tax-collector, and W. E. Harwell as city marshal, seeking to have the ordinance and tax levy therein contained declared to be null and void, and to enjoin the collection of taxes thereunder. The grounds upon which the relief was based were alleged in part as follows: " (1) Because no emergency existed so as to justify its enactment. (2) Because said ordinance is unreasonable. (3) Because no facts existed upon which the mayor, councilmen, and aldermen of the City of Atlanta could reasonably, fairly or justly base any finding that an emergency existed in the City of Atlanta, authorizing the imposition of an extraordinary tax, under the charter of the City of Atlanta. (4) Also because said ordinance was not passed in good faith and for the purpose of dealing with any such emergency, but was passed with knowledge on the part of the mayor, aldermen, and councilmen of the Ci⁴ of Atlanta that no such emergency did exist, and was passed in the form in which it was passed for the purpose of evading and avoiding the provisions of the charter of the city and of violating that portion of the charter of the city wherein it is provided that the power of the mayor and general council of the City of Atlanta to levy ad valorem tax should not exceed one and one fourth per cent. on the ad valorem value of the property within said city, by reciting a conclusion which the mayor, aldermen, and councilmen of the City of Atlanta knew at the time was not warranted by the facts as they existed. (5) Because said ordinance was not passed for the purpose of raising money for the purpose of meeting an emergency, but for the purpose of applying the same to the support and maintenance of schools and of making ordinary repairs on school buildings and building new school buildings in said city, as to which no emergency existed. (6) Because said ordinance does not comply with the intent and spirit of the charter of the City of Atlanta, in that it does not specify or set forth any emergency that exists, such as to justify the imposition of the extraordinary tax which it purports to impose. (7) Also, because it does not comply with the provision in the charter of the city which requires the mayor and councilmen and aldermen of the City of Atlanta to judge as to the

existence of an emergency before an extraordinary tax beyond the $1.25 limit can be levied; for that said ordinance does not set forth, describe, or give any information as to any emergency that does exist as to any matter as to which the mayor and general council of the City of Atlanta are authorized to levy taxation on the inhabitants and taxpayers of said city."

The defendant filed an answer to which was attached as an exhibit the amendment to the ordinance mentioned above. The answer referred specifically to the several paragraphs of the petition, admitting some in whole or in part, and denying others. It also alleged certain contentions of the city as follows: "This extraordinary tax was levied just for the reasons stated, to wit: when the City of Atlanta started the year 1921 it was confronted, in the school department and all other departments, with absolute emergent conditions that required more money than could be raised by the $1.25 per hundred. The public knows that the City of Atlanta is limited to $1.25 taxation on each $100.00 of property, and cannot go beyond this unless in case of an emergency when an extraordinary tax may be levied. Therefore when the estimated income for the year, based on this limit of taxation, was gone over and it was seen that it was not sufficient to meet the absolute and current demands of the city and also answer the extraordinary demands and emergent demands not only in the school but in other departments of the city, there was nothing for the mayor and general council to do except to order the extraordinary tax to take care of the emergency; and this was done."

On the interlocutory hearing the evidence as to an emergency is summarized in the brief of counsel for the city as follows: "R. A. Gordon, being the Gordon mentioned in the ordinance, testified that after the bond election 'it was decided to reduce the tax levy from 45/100 of 1 per cent. to 1/8 of 1 per cent. It was necessary to levy this emergency tax, or to close the schools two months earlier. A deficit existed, a part of it during the last year. The finance committee had to take care of the deficit in some way, or close the schools. The first of this year the city met a deficit in the school department, and had to make that up by some appropriation. After passing the bonds, we thought some of the money could be taken care of by the issue, such as

improvements on schools. By the levy of 45/100 of 1 per cent. we thought this would be about $1,500,000.00. By the levy of 1/8 of 1 per cent. we thought the proceeds would be $275,000 or $325,000. That he was a member of council and made the statement when the first ordinance was passed, that, if the bonds passed, he would introduce an ordinance reducing the levy to 1/8 of 1 per cent. The ordinances were considered and discussed by council on both occasions, pro and con, and a decision was reached after deliberation. Council declared that an emergency existed which justified the tax, and it does exist. As to fire, there was a fire sometime ago, but we had to pay taxes just the same, and no extraordinary tax was passed. If there was a flood, I do not see how it would have any more effect than this fire. I do not see how a sudden fire or tornado or physical calamity could cause an emergency tax. Some of the proceeds of the 45/100 of 1 per cent. emergency tax was to be spent for school buildings and improvements. The emergency tax was levied to take care of the expenses of the city. We saw that we had to make this levy and we could use it wherever we saw fit. The vote on the 1/8 of 1 per cent. was almost unanimous. The tax was made to meet a deficit in the city's income — the effect of the deficit was found to be felt by the schools. It could be felt by the police or fire departments — we would have to do away with some department unless we collect this money.'

Harry Goodhart is a member of general council; was a member when both ordinances were passed; is not a member of the finance committee. The vote on the original ordinance was 15 against and eighteen for it. Does not know of any sudden, unusual, or unexpected thing happening in the city affecting its finances or needs immediately prior to the passage of the original tax ordinance. There has been no fire or tornado or any extraordinary thing happened this year. The city was moving along in the normal, usual method. The school board is a separate body from the city council. The school board spent more money than the city appropriated, being the 22 per cent. allowed under the charter. The cause of the deficiency in the school department was increase in salaries and improvements on the school buildings. The general impression is that the schools will have to close a month earlier this year, 1921, unless this emergency tax is levied.

They have never closed, and as long as he was a member of council they never would, if he could keep them from it. The money will have to come from some other source.

W. D. Hoffman was a member of the general council. Reasonably familiar with the city's financial condition. There was no flood or fire at the time of the passage of the 4.5-mill ordinance. Thinks the emergency was a condition of the waterworks. This was the thing that hit him — the condition of the boiler plant. They were in a position where, if they did break down, they would not have sufficient steam to run the boilers. This was discovered in the early part of 1920. There was trouble with the coagulating basin. There was an appropriation in 1921 to take care of the boilers, under the normal tax. Looks upon the emergency tax as a deficit between income and operating expenses — it may be apportioned among certain items, one item bearing a larger proportion than others. If other departments had cut down such charges as charities, parks, gifts to the Georgia School of Technology, ' I do not know whether there would be enough or not. ' The city is run with as little money as possible, provided we take care of these other things and we thought they were necessities. Under the 1/8 of 1 per cent., there would still be a little deficit. This 45/100, including other things, bonds, would partly take care of it. There have been great fires in Atlanta — tornadoes around this country — these did not cause an extraordinary tax. We need the tax to pay the running expenses of the city — necessary expenses. We could not use this money to replace burned buildings for private owners, if we had it, or to restore houses washed away by flood. Tax money is used to pay the operating expenses of the city. The funds in the treasury of the city are not enough to pay these bills — that is the way I regard it. If a man has not enough money to pay his bills, he simply goes broke. · The city has got to have the money called for by this emergency tax, or quit business the last of this year. Unless the money is raised, we have got to go out of business in some department the last of the year, or go broke. The city is now giving the school board 22 per cent. of its entire income. The salaries of the teachers were raised and the school board had to pay same, and this caused a deficit.'

R. H. Jones Jr. A member of the general council. Was present when the 4½ mill ordinance was passed. Does not know of any

sudden, extraordinary, or unusual happening occurring in the city prior to the passage of this ordinance. Did not hear of any unusual act mentioned which would justify the passage of such ordinance. Voted against the ordinance. Did hear a number say that they thought there was an emergency, in the discussion before council. One of the points discussed was the building of a new Tech High School. Considers an emergency like the breaking of the water-main. Says there is one water-main coming into the city from the pumping station. If that broke, did not know how they would get water from the river to the pumping-station. Thinks it would be wise to provide against this emergency by putting another main alongside the one existing. Would consider this an emergency, just as if it had already broken. The waterworks have large reservoirs which would supply the city for about 3½ weeks. Does not know how long it would take to repair that pipe. Thinks an emergency might exist where the city got to the point where it must have money to run on or stop — if the city had to close its doors that would be a dire calamity or emergency. If, at the beginning of the year, it is found that the schools would have to close in November or December, thinks that would justify the position of voting as they did, if they so believed. He would have so voted if he had so believed. The finance committee discussed the apportionments of the various departments. The salaries are fixed, and all the committee has to do is to pay them. Discusses the fact that fewer books might be used. If the library did not have the books, they would not be doing business as a library to the fullest extent.

B. G. West, city comptroller, got up the sheet for the present year. Prepared the estimates and receipts and expenses. Had been connected with this office for seventeen years. The income of the city is divided into fixed charges. After these have been made, estimates are made for contingent or street work of about $300,000. This is used in equipping the different departments; paying the city's part of paving streets, repairing streets. There was an apportionment sheet made during this year. This sheet showed the amount to be expended would balance the amount estimated to be received, but this did not meet the demands of the city. They must equal one another. We cannot exceed, in our expenses, the total amount received. The sheet must balance.

The charter so requires. There is hardly a department that has not asked for more money. In 1921, if this tax is enjoined, the city will have to stop operating in some one or more departments. The department in mind is the school department. If the emergency tax is added to the present appropriation, it would probably run through the year by very strict economy. Without the emergency tax it would be impossible for them to run. It will not be possible to change the other departments a little and add to the school fund. No department of the city has more money than it can legitimately use and function as a city. I think the police department and fire departments have their charges fixed. If the other departments are cut down, to the extent of the cutting the schools would be relieved, but the departments so cut down would themselves have to stop. The salaries of the policemen were not increased during the year. This was done during the preceding year. The same thing is true of the teachers' salaries. If the money for the streets is taken for the schools, the street department would have to be closed to the extent of the money so withdrawn from them. If the money was taken from the fire department, it would cut out half of the department houses and raise the insurance rate. The money has been wisely apportioned, and council did the best they could. Several departments this year asked for about twice as much as they received in appropriations. By fixed charges he means interest charges, taking care of bonds, sinking-funds, pay of policemen and firemen, salaries. These are fixed during the preceding year. 22 per cent. of the total income goes to the schools, and of this 22 per cent. apportioned to schools the school board has the discretion of the use of the money apportioned to it. Private corporations increased salaries during the war. The city had to do the same thing, or close up. During the present year, the city has reduced the appropriation to the sanitary department $50,000. The street department 10 to 15 per cent. In other departments, in similar proportions. The total reduction would amount to $125,000 to $130,000. Real-estate assessments were increased, and these increases take care of the normal demands of the various departments. Only about balance then. Many of the items in the sheet are on both sides, such as $750,000.00 for loans; also street paving. A good many departments could be closed if council saw fit to do so. The Cyclorama,

Advertising Clubs Convention, Freight Bureau, Advertising Georgia, School of Technology, certain school buildings, certain charities such as Holmes Institute, Atlanta Medical College, Church Home for Girls, and general benevolences. The city has got to take care of them. If we do not have the emergency tax, and put the deficit in one department, that department must stop.

James L. Key, Mayor of the City. Gives a history of the three levies in detail. Refers to the schools, cyclorama, water-mains, etc. Described particularly the Tech High School; the inadequacy of the schools, some of which he describes as being horrible. Some taught in the afternoon. Some teach three classes a day, one teacher doing this work. Some taught in basement rooms. During the war period, hundreds of teachers left the schools for better pay. It was simply a question of raising their pay or losing the teachers. Described the effect of the bond issue upon the emergency tax. Refers to the waterworks department, the bridge fund, sewer fund, etc. The city was required to meet competition in the employment of its employees. Could not get work done any cheaper than anybody else. Could not buy supplies any cheaper than anybody else. This increased the expenses, and therefore the income must be increased or else stop. These economical conditions had been brought about by war conditions — a sudden, unforeseen upheaval and disturbance of normal conditions. Considers such a condition an emergency, a very great emergency, a very extreme emergency. This condition has been gradually growing worse in the city from time to time, and the point has been reached where it cannot go along any further without an emergency tax.

W. F. Dykes, superintendent of schools. Has been connected with the school system twenty-six years; with the high school for eleven years. Appropriation for the present year is $1,185,197.79. The total amount needed to run the schools during the scholastic year is $1,641,050.00. This is arrived at after going over the cost of supplies, salaries, and all other matters are considered. If this amount is not secured, the schools will have to be closed the first of October. He thinks it better not to open in September at all, for the reason that it takes two or three weeks to get under way; and as the schools would open sometime about the 1st of September, it would be a useless expenditure of money to run them only two

or three weeks. In case the schools close, the teachers will scatter and get positions elsewhere. When they open up next year, it will be impossible to get the same teachers for the same classes, and the schools will be very much hampered. 'These are not fanciful things that I am indulging in, but absolute facts, as I see them. Our teachers are being sought now by other cities, and most any of them can get places elsewhere at any time. If the schools are closed, an investment of $2,000,000.00 in school buildings will be idle. The city might lose the State appropriation of $145,000.00 for not running for the time allowed by the State. Thus the emergency tax is required and necessary. The teachers receive only enough to cover actual living expenses. The high cost of living has made higher salaries necessary. We have lost a great many teachers now who went into other lines of work. After the first raise, the minimum salary of teachers is $66.00 per month. This has been raised to $88.00 per month.' Gives a full statement of the schools, cost of labor, cost of supplies, etc. At the conclusion of his testimony he states that he is familiar with the other departments of the city, and thinks they have been cut as closely as possible, and a good many of them have been cut too closely in appropriations. Compulsory education makes additional expenses, such as providing additional schoolrooms, additional help to look after the children, etc."

Upon consideration of the case the judge granted an interlocutory injunction, and the defendant excepted.

*J. L. Mayson* and *J. M. Wood*, for plaintiffs in error.

*Little, Powell, Smith & Goldstein* and *Moore & Pomeroy,* contra.

ATKINSON, J. At the beginning of the year 1921, the mayor and council levied an ordinary tax for the full amount which was authorized under the municipal charter. At the time this was done it was estimated that the amount of taxes so levied would not meet all of the expenditures contemplated by the mayor and council in meeting demands upon the city and current expenses for the year 1921. Thereupon an additional tax was levied, on the hypothesis that the provisions of the charter of the city relating to an emergency tax would authorize the levy of such additional tax. A copy of the provision of the charter referred to follows: "In addition to the ordinary tax herein allowed, the mayor and councilmen and aldermen may, in case of emergency,

to be judged of by them, levying an extraordinary tax, not exceeding one half of one per cent. (on the taxable property of said city), the said extraordinary tax to be added to the ordinary tax, and collected at the same time, and used for the same purpose." City Code of Atlanta, 1910, § 124. The plaintiffs in attacking the ordinance contended that no emergency existed; and therefore that the city did not have authority, under the above provision of the charter, to levy the so-called emergency tax. The city contended, firstly, that the provision of the charter above quoted conferred on the mayor and council absolute power to determine whether or not an emergency existed; and secondly, the circumstances under which the extraordinary tax was levied were such as to require the trial judge to hold, as a matter of law, that an emergency did in fact exist. These questions will be dealt with in their order.

1. The first question depends upon a proper construction of the provision of the charter relating to the levy of an extraordinary tax. In a somewhat similar case it was said: "We are here dealing with the taxing power, proceedings in which are always in invitum,— a power which, when exercised under delegated authority by a municipal corporation, is always subject to rigid scrutiny, first, to determine whether the power actually exists; and, second, to determine whether it has been exercised under the limitations imposed. For, says Sutherland, treating of acts delegating the power of taxation: 'Acts of this class are construed with great strictness. Two concurring principles leading to strict construction apply. Such acts affect arbitrarily private property, and are grants of power.' 2 Lewis's Sutherland on Stat. Constr. § 541." San Christina Investment Co. v. San Francisco, 167 Cal. 762 (141 Pac. 384, 52 L. R. A. (N. S.) 676, 682). The principle above applied is well recognized, and has been frequently applied in this State. Albany Bottling Co. v. Watson, 103 Ga. 503 (30 S. E. 270); Garrison v. Perkins, 137 Ga. 744, 752 (74 S. E. 541). The case of San Christina Investment Company v. City and County of San Francisco, supra, involved construction of the charter of the City and County of San Francisco, and the validity of an alleged emergency tax. Section eleven of the charter there construed provided, in substance, that the annual levy "shall not exceed the rate of $1 on each $100 valuation of the property

assessed." Section thirteen of the same article and chapter provided: " The limitation in § 11 of this chapter upon the rate of taxation shall not apply in case of any great necessity or emergency. In such case the limitation may be temporarily suspended, so as to enable the supervisors to provide for such necessity or emergency. No increase shall be made in the rate of taxation authorized to be levied in any fiscal year, unless such increase be authorized by ordinance passed by the unanimous vote of the supervisors and approved by the mayor. The character of such necessity or emergency shall be recited in the ordinance authorizing such action, and be entered in the journal of the board. . ." The ordinance referred to in the decision was adopted in 1910, and declared: " Section 1. It is hereby recited, determined, and declared that a great necessity and emergency exists within the City and County of San Francisco, which requires that the limitation of taxation contained in § 11, chapter 1 of article III of the charter of said city and county be temporarily suspended, and that the character of such necessity and emergency is as follows, to wit: On the 18th day of April, 1906, a large number of the public buildings, and other structures, and much of the fire-department equipment of said city and county were destroyed by fire, and on said day a large extent of the public sewers of said city and county were damaged and destroyed by earthquake; that a large extent of the public streets of said city and county were damaged by the combined effects of fire and earthquake; also there is danger that the bubonic plague, prevalent in 1907, may recur, and provision should be made to prevent such recurrence; that it has been impossible to pave, repave, and repair streets, reconstruct and repair sewers, construct and repair the public buildings destroyed and damaged as aforesaid in April, 1906, from the appropriations heretofore made, and the great necessity and emergency hereby declared to exist has not been adequately provided for by previous tax levies made by the board of supervisors. Sec. 2. That by reason of the great necessity and emergency, herein set forth, large sums of money will be required to be expended by the city and county during the fiscal year ending June 30, 1911, for the paving, grading, repaving, and repairing of streets, for the reconstruction and repair of sewers, construction of and repairs to public buildings, for construction and equipment of fire-department

buildings, for the purchase of lands for fire-department buildings, for the reconstruction of, repairs to, and equipment of school-department buildings, for the construction and equipment of police-department buildings, and for the purchase of lands for police-department purposes, and for the continuation and enforcement of sanitary measures. That the large sums required for the aforesaid purposes cannot be obtained from the annual income and revenue of the city and county, and said necessary expenditures cannot be made without temporarily suspending the limitation upon the rate of taxation provided for in § 11 of chapter I of article III of the charter of said city and county." After a review of a number of authorities, some of which are relied on by plaintiffs in error in this case, the court said: " In the light of these fundamental principles we come to the immediate question : Does the charter of San Francisco in terms or by necessary implication make the determination of the supervisors as to the existence of a great emergency or necessity conclusive ? Manifestly it does not. The language of the charter is not that the dollar limit may be suspended upon the declaration of the supervisors that a great emergency or necessity exists. It is that this limit may be suspended ' in case of [the existence of] any great necessity or emergency.' Moreover, and as persuasive to this view, even were it not so plain as it appears, is the added fact that the supervisors are required to spread upon the journal ' the character of such necessity or emergency.' . . Webster's International Dictionary defines ' emergency ' as ' An unforeseen occurrence or combination of circumstances which calls for an immediate action or remedy; pressing necessity; exigency.' This definition is approved in People v. Lee Wah, 71 Cal. 80, 11 Pac. 851. It is the meaning of the word that obtains in the mind of the lawyer as well as in the mind of the layman. It was not in contemplation that the supervisors could foster and nurse such an emergency so as to spread their taxing power over an undetermined number of years. As little was it designed that under the head of emergency or necessity should be imposed taxes not bearing forcefully and directly on the relief, cure, or prevention of this emergency or necessity. Recalling once more to mind the fact that the exercising of the taxing power, for the reasons already given, is subject to strict construction, the trial court will

scrutinize the items presented: First, to determine whether or not the great emergency or necessity, within the meaning of the charter, existed at the time of the levy; and second, whether, if it be found that such emergency or necessity did in fact exist, any of the items in the levy do not fairly come within the purport and scope of such emergency levy. And, finally, it must be said that no argument of hardship or inconvenience will justify a court in setting at naught the written terms of a city's charter, even at the instance of the city's officials. As was said by this court in Connelly *v.* San Francisco, 164 Cal. 101, 127 Pac. 834: ' An inconvenience to the city does not justify the despoiling of its taxpayers.' If these large revenues sought to be raised by the city do not fairly come within the purview of an emergency tax measure, it is for the city to meet the desired end either by the issuance of bonds or by an amendment to its charter. It is not for the courts themselves to amend this charter by striking therefrom any of its salutary and protective provisions." See also Josselyn *v.* San Francisco, 168 Cal. 436 (143 Pac. 705). For other definitions of emergency see *Seaboard Air-Line Ry.* v. *McMichael,* 143 *Ga.* 689, 695 (85 S. E. 891); 20 C. J. 499.

The foregoing discussion is pertinent to the case under consideration. Applying the principles therein stated, the provision of the charter of the City of Atlanta relating to an extraordinary tax does not provide that the mayor and council of the city may levy an extraordinary tax if the mayor and council shall declare an emergency to exist, but the provision is that an extraordinary tax may be levied, " in case of emergency, to be judged of by them." If an emergency exists in fact, and if the mayor and council shall so declare, the tax may be levied; if however no emergency exists, the declaration by the mayor and council that an emergency exists will not authorize the tax. The provision of the charter does not expressly declare that the finding of the mayor and council that an emergency exists shall be conclusive. The express provision of the charter is " in case of emergency," and the legislature did not intend to leave to mere implication the power to conclusively declare the existence of an emergency, in view of the express declaration that an additional tax is authorized " in case of emergency."

2. The evidence relied on to show the existence of an emergency upon which to base the levy of the additional tax is insufficient

for that purpose; and the court did not err in granting the interlocutory injunction.

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent.*